# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF OHIO

# WESTERN DIVISION

| | |
|---|---|
| AtriCure, Inc., a Delaware corporation, | |
| Plaintiff, | Case No.  1:19-cv-00054 |
| v. | |
| Dr.  Jian "Larry" Meng, an individual; Dr. Guanglu Bai, an individual; and Beijing Medical Scientific Co.  Ltd., *d/b/a* Med-Zenith, a China company, | **COMPLAINT** |
| | (Demand for Jury Trial) |
| Defendants. | |

Plaintiff AtriCure, Inc. ("AtriCure"), by and through undersigned, for its Complaint against Dr. Larry Meng, also known as Dr. Jian "Larry" Meng ("Dr. Meng"), and Dr. Guanglu Bai ("Dr. Bai") (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.     AtriCure is an Ohio based medical device innovator that has developed sophisticated technological solutions in surgical devices distributed amongst hospitals worldwide to treat atrial fibrillation ("Afib"), a serious and frequently degenerative heart condition.

2.     Beginning in or around 2007, AtriCure began a business relationship with Beijing ZenoMed Scientific Co., Ltd. ("ZenoMed"), which developed into the 2016 Distribution Agreement to facilitate the sale of AtriCure's products in China.  As part of its business relationship with AtriCure, ZenoMed was also responsible for securing regulatory approvals in China.

3.      ZenoMed has since breached the Distribution Agreement in numerous respects, including acting to steal AtriCure's intellectual property by developing counterfeit competitive devices, which are currently being sold in China and elsewhere in the world, and refusing to pay for goods sold and delivered to it by AtriCure.

4.      Dr. Meng, the President of ZenoMed, and his colleague Dr. Bai, were the primary wrongdoers that directed and caused ZenoMed's breaches.  Moreover, they engaged in and directed a fraudulent scheme in knowingly inducing AtriCure into providing them with its proprietary technology and intellectual property, which they then misappropriated in concert with ZenoMed and Beijing Medical Scientific Co. Ltd., *d/b/a* Med-Zenith ("Med-Zenith"), to produce illegal counterfeit products and wrongfully compete with AtriCure in the People's Republic of China and throughout the world.

5.      The wrongful conduct of Dr. Meng and Dr. Bai aided and abetted ZenoMed's contractual breaches, facilitated a conspiracy to misappropriate AtriCure's intellectual property and business, perpetrated a fraud upon AtriCure, and tortiously interfered with AtriCure's business.  They acted with others, including Med-Zenith, to create identical in appearance surgical products ("knock-off" products) and have commenced licensing and patent approval for those products in China, all while they were bound to use their best efforts to advance the AtriCure products.

6.      Not only has Defendants' conduct brazenly violated AtriCure's legal rights, but it also poses a significant public health risk in China and elsewhere around the world in which the Defendants placed the counterfeit devices into the stream of commerce by putting Afib patients and surgeons at risk while using ZenoMed's inferior and dangerous counterfeit devices.

## THE PARTIES, JURISDICTION, AND VENUE

7.      AtriCure is a Delaware corporation with its principal place of business in Mason, Ohio.

8.     Dr. Meng is a Chinese individual residing in Beijing, China who is the President of ZenoMed, a corporation organized and existing under the laws of the People's Republic of China, and having its principal office at Rm1802, B building, Cyber Tower, No. 2 Zhong guancun South Ave., Beijing, China 100086.  Upon information and belief, Dr. Meng also maintains a residence in Canada.

9.     Dr. Bai is a Chinese individual residing in Beijing, China who, upon information and belief, is the former Director of Research & Development for ZenoMed and is currently its legal representative.

10.     Beijing Medical Scientific Co. Ltd., *d/b/a* Med-Zenith, is a corporation organized and existing under the laws of the People's Republic of China, and having its principal office at NO.5, 2nd Zhuyuan Street, Tianzhu Free Trade Zone, Shunyi Districe, Beijing, 101312, P.R. China.

11.     Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. §§ 1332 and 1391(b) because: (1) the amount in controversy exceeds $75,000, exclusive of interest and costs and the parties are completely diverse; and (2) a substantial portion of the events or omissions giving rise to the claims asserted herein occurred in Ohio.  Among other things, Defendants have visited AtriCure's headquarters in Mason, Ohio related to the business dealings giving rise to the claims asserted herein to see and inspect the manufacturing of the devices at issue in furtherance of their fraudulent scheme on the citizens of Ohio.

## FACTUAL BACKGROUND

### AtriCure's Business

12.     Afib is a serious and frequently degenerative heart condition involving "quivering or irregular heartbeat (arrhythmia) that can lead to blood clots, stroke, heart failure and other heart-related complications."[1] At least 2.7 million Americans are living

---

[1]   American Heart Association, What is Atrial Fibrillation (AFib or AF)? (https://www.heart.org/en/health-topics/atrial-fibrillation/what-is-atrial-fibrillation-afib-or-af).

with Afib, with global estimates exceeding 30 million. Overall, as global diagnoses improve, one in four adults over age 40 will develop Afib during their lifetimes. This poses particular risk in Asia where contributing medical conditions, such as rheumatic fever, remain common. Individuals with Afib are five to seven times more likely to suffer a major, debilitating stroke.

13.     Untreated, Afib is life threatening and in all cases is life altering. Patients suffer from episodes of circulatory problems as the heart is substantially impaired in the delivery of its pumping function for blood throughout the body. Patients are at high risk for stroke, and in many cases report lethargy and inability to perform normal daily functions involving any physical exertion. In response to this emerging global health problem, AtriCure was founded in 2002 to develop innovative technological solutions for the treatment of Afib electrical impulse irregularity and related conditions.

14.     Millions of dollars have been spent on research and development, and the Ohio economy will be affected adversely if the products are illegally stolen and knocked-off by the Defendants identified here.

15.     AtriCure's Isolator® Synergy™ Ablation System ("Isolator System") is the first and only medical device of its kind to receive regulatory approval for treatment of long standing persistent Afib from the United States Food & Drug Administration ("FDA"). The Isolator System has also received CE marking, and been approved for sale by medical device regulatory bodies around the world, including multiple EU countries and Japan. The Isolator System has been utilized to treat hundreds of thousands of patients over the past ten years and has achieved industry leading positive outcomes.

16.     The Isolator System consists of AtriCure's proprietary Ablation and Sensing Unit ("ASU"), combined with the Ablation Switch Box ("ASB") and a variety of single-use clamps, pens and linear ablation devices that attach to and are powered and controlled by the ASU and ASB. The ASU both delivers energy to the single-use components, and communicates with them to monitor ablations being applied to the heart in real time and

notifies the surgeon when the ablation is complete. The ASU notification system is based on a complex and proprietary algorithm developed by AtriCure after hundreds of thousands of tests. This algorithm performs virtually simultaneous multi-factoral problem solving that allows the system to assess ablation success as it is happening and adjusts the power or other technological factors of the system in real time. Developing the algorithm and entire Isolator System to work effectively together required immense engineering research and development. This effort ultimately led to a unique technology in the industry that is significantly more effective, efficient, and safer than its competitors. This system was researched, designed, and developed to operate holistically so that the ASU and Isolator System works effectively, efficiently, and safely only as a system—not as individual components. The research and development for the Isolator System took multiple engineers and other personnel tens of thousands of man hours, over 5 years, and tens of millions of dollars to successfully develop the Isolator System ultimately brought to market. *See* photos of AtriCure's devices accompanied by descriptions of their use attached hereto as **Ex. 1**.

17.     Without authentic components of the Isolator System working together as a whole, the risk of permanent damage to the heart, including perforations resulting from excessive ablations, increases substantially. Inadequate or improper ablations may also induce other arrhythmias that are substantially more dangerous to patients than Afib, such as atrial flutter.

18.     Patients who have undergone procedures with AtriCure's devices have achieved substantial improvements in long term health, with 10 year mortality rates nearly 50% lower than individuals who did not receive treatment.

19.     Hospitals worldwide and in Asia are eager to use the technologically advanced and effective products developed by AtriCure.

### The Distribution Agreement

20.     On January 1, 2016, AtriCure, and ZenoMed entered into a contract titled Distribution Agreement Between AtriCure, Inc. and Beijing ZenoMed Scientific Co., Ltd. Effective date January, 2016 (the "Distribution Agreement") for the sale of AtriCure products in China.  *See* Distribution Agreement, a true and correct copy of which is attached hereto as **Ex. 2.**

21.     On January 1, 2017, AtriCure and ZenoMed renewed the Distribution Agreement (the "Renewal Agreement").  *See* Renewal Agreement, a true and correct copy of which is attached hereto as **Ex. 3.**

22.     On December 31, 2017, the Renewal Agreement expired, which had the effect of terminating the Distribution Agreement.  *See* **Ex. 2** at §10.1 and **Ex. 3**.

23.     The Distribution Agreement was consistent with the prior working relationship between the parties and provided for ZenoMed to serve as AtriCure's exclusive distributor for its Isolator System and other related products in the People's Republic of China.  *See* **Ex. 2** at §2, Schedule A.

24.     Zenomed has, at all times, been chiefly represented by the two Defendants. These Defendants acted together and in conspiracy with others to form a competing company and knock-off the AtriCure products.  They did not sign the AtriCure Distribution Agreement as individuals, and are therefore not subject to the arbitration remedies provided.

25.     As ZenoMed was charged with responsibility for licensing in China, and held itself out as having expertise to do so, the officers of ZenoMed, the Defendants here, were given access to proprietary and confidential information owned by AtriCure.   In conjunction with this distribution and licensing effort, ZenoMed purchased products from AtriCure, and then had the right to market and sell them throughout the People's Republic of China.  *See* **Ex. 2** at §2 and §3.

26.    By its terms, AtriCure could terminate the Distribution Agreement upon written notice if ZenoMed failed to make full payments owed, violated the Distribution Agreement's non-compete provision, or committed "[a]ny other material breach of this Agreement … (including, without limitation, making any sales of Products outside the Territory). …" *See* **Ex. 2** at §10.2.1.

27.    As noted above, the Distribution Agreement included a non-compete provision at §2.3 (the "Non-Compete Agreement"), which provides that "[ZenoMed] hereby declares and warrants that Distributor is not, during the term of this Agreement and for a period of twelve (12) months after its expiration or termination, shall not be involved in the distributing of any products or services which, in the judgment of AtriCure, compete with the Products anywhere in the world." *See* **Ex. 2** at § 2.3.

### Unpaid Inventory and Unmet Continuing Obligations

28.    As of the date of expiration of the Distribution Agreement, ZenoMed owed AtriCure $1,104,937.20 USD for inventory already received by ZenoMed pursuant to the Distribution Agreement (the "Accounts Receivable").

29.    This inventory is still believed to be in ZenoMed's possession and is believed to be stored in Hong Kong (the "Inventory").

30.    As of the date of this Complaint, ZenoMed has not paid the Accounts Receivable, nor returned the Inventory following several demands for compliance with the Distribution Agreement.

31.    After expiration and termination of the Distribution Agreement, ZenoMed has several obligations which remain in effect, including the following pertinent provisions (collectively, the "Continuing Obligations"):

> Inventory Report.  ZenoMed was required to provide a report indicating the quantity of products in ZenoMed's Inventory within ten (10) days of receiving the Notice Letter.  However, ZenoMed did not provide any inventory report until over a month after the termination notice. *See* **Ex. 2** at §10.2.3(a).

Non-Compete. The Non-Compete Agreement expressly remains in effect "for a period of twelve (12) months after [the Distribution Agreement's] expiration or termination. *See* **Ex. 2** at §2.3.

Territorial Scope. The Distribution Agreement provides that "[d]uring the term of this Agreement *and for a period of two (2) years thereafter*, [ZenoMed] shall, in addition to legal requirements of the Territory, keep and maintain, at [ZenoMed's] principal place of business, true and accurate books of account and record of all transactions that relate to or affect this Agreement." *See* **Ex. 2** at §5.5.1.

Books and Records. The Distribution Agreement provides that "[i]n the event of a termination of this Agreement, during the two-year period following the termination or expiration hereof, such books and records together with all supporting documentation shall be open for inspection by AtriCure or its representatives for purposes of compliance with applicable laws, during regular business hours and upon reasonable notice (with the right, at AtriCure's expense, to make copies thereof and take excerpts therefrom)." *See* **Ex. 2** at §5.5.2.

Sales Information. The Distribution Agreement provides that "[d]uring the term of this Agreement and for a period of two (2) years thereafter, Distributor shall keep records of the part number, LOT number and other essential sales information for each individual customer of Distributor. The information shall be made available within two (2) days upon written request from AtriCure for regulatory requirements." *See* **Ex. 2** at §5.5.3.

Assignment of License. The Distribution Agreement provides that "If any applicable law or regulation requires that any License be in the name of Distributor, Distributor shall promptly assign such License to AtriCure, without compensation, upon the termination or expiration of this Agreement for any reason." *See* **Ex. 2** at §5.10.

Confidentiality. ZenoMed also must "keep secret and hold in confidence any Confidential Information provided or disclosed by AtriCure and will ensure that its employees, agents, sub-distributors act accordingly. The Distributor may not disclose, use or deal with the confidential information in any way to obtain a benefit for itself or its employees, agents or sub-distributors, unless with the express authorization of AtriCure first obtained in writing." *See* **Ex. 2** at §6.

Trademarks. The Distribution Agreement also required ZenoMed to cease to have any rights to use the Trademarks (as defined in the Distribution Agreement, including in particular the "AtriCure" trademark and

tradename). *See* **Ex. 2** at §7.2 and §7.3.

<u>Use of Intellectual Property</u>. Upon expiration and/or termination, the Distribution Agreement requires ZenoMed to "promptly [] remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or licensed exclusively by AtriCure, or any word, title, expression, trademark, design, or marking that is confusingly similar thereto." *See* **Ex. 2** at §10.2.3(d).

32.    AtriCure provided formal written notice to ZenoMed regarding each of the post-expiration and termination obligations under the Distribution Agreement in its Correspondence from AtriCure to ZenoMed dated 30 May 2018 (the "Notice Letter"). *See* Notice Letter attached hereto as **Ex. 4**.

33.    ZenoMed never responded to the Notice Letter. Moreover, it has failed to comply with each and every one of the Continuing Obligations under the Distribution Agreement

34.    Specifically, ZenoMed has: (1) not paid for the Accounts Receivables; (2) not returned the Inventory, (3) not destroyed expired Inventory; (4) directly competed with AtriCure by engaging in the distribution of competing products and services; (4) not provided AtriCure access to its books and records; (5) not provided sales and customer information to AtriCure upon request; (6) not assigned its License to AtriCure; (7) not complied with its obligations to maintain the confidentiality of AtriCure's Confidential Information; (8) wrongfully utilized AtriCure's trademarks; and (9) not removed and discontinued use of trademarks, designs, and markings owned or licensed to AtriCure.

**Defendants' Fraudulent Scheme to Wrongfully Compete**

35.    As noted above, despite the expiration of the Distribution Agreement, ZenoMed has continued to hold itself out as AtriCure's authorized representative in the People's Republic of China.

36.     Even as of the date of this Complaint, long after the 31 December 2017 expiration of the Distribution Agreement, ZenoMed has attempted to market and sell the Inventory throughout the People's Republic of China.

37.     ZenoMed and its principals, Dr. Meng and Dr. Bai, have stolen AtriCure's intellectual property, which they are now marketing for sale around the world thorough a separately incorporated company that contains representatives formerly or currently affiliated with ZenoMed.

38.     Med-Zenith, a company formed under the laws of the People's Republic of China, purportedly specializes in the research and development, production, and sales of medical devices and biomedical engineering materials.  It is headquartered in the Shunyi District of Beijing.  Med-Zenith is fully owned by a Hong Kong based company called Fortune Express (HK) Investment Limited ("Fortune Express'), and is believed to be controlled by Dr. Meng.

39.     Defendants have worked in concert with ZenoMed and Med-Zenith to misappropriate AtriCure's intellectual property, produce illegal counterfeit products, and wrongfully compete with AtriCure in the People's Republic of China and, upon information and belief, throughout the world.  This demonstrates evil intent and a planned effort to use AtriCure technological and proprietary information for their own illegal purposes wherein they did not  take proper steps to maintain the confidential and proprietary information of AtriCure, and that Dr. Meng and Dr. Bai have in fact conspired with ZenoMed and Med-Zenith to knowingly misappropriate such confidential and proprietary information.

40.     Dr. Meng and Dr. Bai provided Med-Zenith with AtriCure's Confidential Information and intellectual property obtained in their roles with ZenoMed.  Med-Zenith is now using such information to manufacture, market, and sell products competing with AtriCure.  It is also seeking patent protection in the People's Republic of China for products developed with AtriCure's Confidential Information.   These counterfeit products are

competing directly with AtriCure's products. Indeed, they have been designed and labelled to be virtually identical to AtriCure's devices. *See* photos of counterfeit devices attached hereto as **Ex. 5.**

41.     In addition, Med-Zenith has attempted to counterfeit AtriCure's ASU, which is at the core of the clinically successful and safe use of the ablation devices. As noted, the ASU notifies the surgeon when the ablation is complete, which helps avoid permanent damage caused by burns to the heart tissue. The ASU's algorithm is based on extensive testing conducted by AtriCure over hundreds of thousands of ablation procedures and regulatory approval. Given the immense research and development involved in the development of the algorithm, Med-Zenith is believed, at least to date, to have failed to completely and accurately replicate the ASU, with numerous reports of serious complications in procedures using Med-Zenith's counterfeit ablation devices with power delivery devices.

42.     To address this complication in their scheme, Med-Zenith developed an adaptor to connect their counterfeit ablation devices to AtriCure's ASU, thus permitting it to wrongfully utilize AtriCure's algorithm – itself core intellectual property developed at significant cost by AtriCure – without even having to replicate it. It is believed that even with the adaptor connecting Med-Zenith's counterfeit ablation devices to AtriCure's authentic ASU, Med-Zenith's counterfeit ablation devices still fail to safely and effectively replicate the results achieved by properly using the authentic AtriCure Isolator System. *See* photos of Defendants' counterfeit adaptor attached as **Ex.** .

43.     Med-Zenith has marketed, sold and continues to sell counterfeit AtriCure products manufactured in China outside of China. In this illegal pursuit, the Defendants have regularly traveled into the United States for medical conferences and to "conduct business with AtriCure."

44.     In parallel with its efforts to counterfeit AtriCure's devices, Defendants' malfeasance in their responsibilities related to the regulatory approval process for

AtriCure's devices in China aided their ultimate efforts to capture the market with their own counterfeit devices. In the normal course of business, the regulatory process in China can require up to three years to complete. As part of its business relationship with AtriCure, ZenoMed was responsible for, based on Defendants' representations, shepherding numerous AtriCure products, including the Isolator System and other AtriCure products, through the China medical device approval process. Throughout this process, Defendants represented to AtriCure that ZenoMed was engaging with Chinese regulators to obtain these necessary approvals. However, conveniently for them, submissions were made incorrectly with basic errors, were made after deadlines that ZenoMed was aware of, and, in some cases, may never have been made at all. Even as of the date of this Complaint, many AtriCure products that have been approved in every other major medical device market around the world still have not received regulatory approval in China, due to the negligence and/or intentional wrongdoing of Defendants.

45. Shockingly, at the same time, Defendants – through Med-Zenith – have submitted and received regulatory approval to sell counterfeit AtriCure devices, including counterfeits of AtriCure devices that ZenoMed was supposed to, but did not, obtain China regulatory approval for. This pattern of behaviour, knowingly and intentionally driven and perpetuated by Defendants Dr. Meng and Dr. Bai, has caused multi-year delays in regulatory approval for AtriCure products, allowed Defendants to maintain monopolistic control over the technology in the country, and allowed Defendants to gain market share with counterfeit competitive devices under their control.

46. In December 2018, Med-Zenith went so far as to submit a counterfeit AtriCure device – the MZ-RFS-I Clamp – to an "Innovation List" developed by the Chinese Ministry of Science and Technology (the "MOST List") for innovative devices developed in China. The MOST List endorses products for preferential use throughout the Chinese domestic hospital network. Upon learning of this submission, AtriCure presented

a formal objection on 9 December 2018 to the inclusion of ZenoMed's counterfeit device in the MOST List.

47.     Beyond Defendants' brazen theft of AtriCure's intellectual property, their wrongful conduct presents a serious public health risk.  The inferior products create grave risks to patients of Afib procedures, including serious permanent damage to the heart resulting from improper or excessive ablations.  Upon information and belief, such complications have already been reported throughout China.

48.     On or about 9 September 2018, AtriCure sent Defendants correspondence demanding an accounting of the Inventory and payment for any Inventory sold or expired (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Ex. 7**.

49.     AtriCure stated in the Demand Letter that it intended to repurchase Inventory after being provided an accounting.

50.     AtriCure also informed Defendants that it had appointed a new authorized distributor in the People's Republic of China: BaHeal Wellness Industry International Trading Limited, a company organized and existing under the laws of Hong Kong, and sub-distributor Qingdao BaHeal Medical Inc., a company organized and existing under the laws of the People's Republic of China (collectively, "Ba-Heal").

51.     Defendants' efforts to interfere with the Inventory and their continued contact with hospitals in China is party of an apparent effort to create confusion regarding AtriCure's products and new distributors in China.

52.     Neither ZenoMed nor Dr. Meng or Dr. Bai have responded to the Demand Letter as of the date of this Complaint.

53.     Plaintiff subsequently learned of Defendant Dr. Meng's prior litigation in the United States in which he was accused of similarly deceptive trade practices as in this case, including the reshippment of goods into China, and other violations, including of the Foreign Corrupt Practices Act.  See AGA Medical Corporation v. Meng, et al., Case No.

06-CV-364, Order on Partial Motion to Dismiss at 2 (D. Minn. February 11, 2008) (noting that AGA Medical Corporation terminated Meng's company's distributorship "because of [its] failure to pay for products received and concerns about the FCPA violations."). See also Hijazi Medical Supplies, et al. v. AGA Medical Corporation, et al., Case No. 07-3419 (D. Minn.).

## CLAIMS FOR RELIEF

### COUNT I

### (Tortious Interference Against All Defendants)

54.     AtriCure incorporates paragraphs 1-53 as if set forth fully herein.

55.     AtriCure is a global provider of medical devices to treat Afib. It was in a business relationship with ZenoMed as its Distributor of its products in the Chinese market before and during the period of the Distribution Agreement.

56.     Both ZenoMed and Med-Zenith are engaging in direct competition in China, and, upon information and belief in other markets.

57.     Dr. Meng and Dr. Bai were fully aware of the Distribution Agreement as they are the principals of ZenoMed. They caused ZenoMed to breach the Distribution Agreement, continue causing it to attempt to illegally sell the unsold inventory to undercut AtriCure and its new distributor Ba-Heal, and conspired with and aided Med-Zenith in its production and sale of counterfeit competing medical devices.

58.     Through the actions described herein, the Defendants knowingly and intentionally interfered with AtriCure's existing and future potential contractual relationships with ZenoMed, Ba-Heal, their affiliates and subsidiaries, as well as potential opportunities with other distributors and customers.

59.     As a direct and proximate result of the Defendants' actions, AtriCure has been damaged, as provided herein, stemming from the Defendants' tortious conduct.

60.     Upon information and belief, the Defendants' actions were occasioned by bad faith and greed, ill will, and an evil mind, as the Defendants sought to steal and profit

from AtriCure's technology related to which AtriCure had previously contracted with ZenoMed.

61.    AtriCure seeks remedies including compensatory damages in an amount to be proven at trial, punitive damages, and its reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT II

### (Misappropriation of Trade Secrets Against All Defendants)

62.    AtriCure incorporates paragraphs 1-61 as if set forth fully herein.

63.    The Defendants' acts complained of herein constitute misappropriation of trade secrets as defined by the Ohio Trade Secrets Act R.C. §§ 1333.61 to 1333.69.

64.    Defendants improperly disclosed AtriCure's confidential, proprietary, and trade secret information to Med-Zenith and/or their affiliates without AtriCure's consent.

65.    The Defendants acquired confidential, proprietary, and trade secret information from AtriCure, with knowledge that such information was acquired by and utilized for improper means.

66.    As a direct and proximate result of the Defendants' actions, AtriCure has been damaged, as provided herein, stemming from the Defendants' tortious conduct.

67.    Upon information and belief, the Defendants' actions were occasioned by bad faith and greed, ill will, and an evil mind, as the Defendants sought to steal and profit from AtriCure's technology related to which AtriCure had previously contracted with ZenoMed.

68.    AtriCure seeks remedies including compensatory damages in an amount to be proven at trial, punitive damages, and its reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT III

### (Unfair Competition Under Ohio Law Against All Defendants)

69.    AtriCure incorporates paragraphs 1-68 as if set forth fully herein.

70.     The Defendants' acts complained of herein constitute unfair competition under the laws of the State of Ohio.

71.     As a direct and proximate result of the Defendants' actions, AtriCure has been damaged, as provided herein, stemming from the Defendants' tortious conduct.

72.     Upon information and belief, the Defendants' actions were occasioned by bad faith and greed, ill will, and an evil mind, as the Defendants sought to steal and profit from AtriCure's technology related to which AtriCure had previously contracted with ZenoMed.

73.     AtriCure seeks remedies including compensatory damages in an amount to be proven at trial, punitive damages, and its reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT IV

### (Deceptive Trade Practices Against All Defendants)

74.     AtriCure incorporates paragraphs 1-73 as if set forth fully herein.

75.     The Defendants' acts complained of herein constitute deceptive trade practices under the Ohio Deceptive Trade Practices Act, RC Chapter 4165.

76.     As a direct and proximate result of the Defendants' actions, AtriCure has been damaged, as provided herein, stemming from the Defendants' deceptive conduct.

77.     Upon information and belief, the Defendants' actions were occasioned by bad faith and greed, ill will, and an evil mind, as the Defendants sought to steal and profit from AtriCure's technology related to which AtriCure had previously contracted with ZenoMed.  The Defendants have sought to pass off their counterfeit products as authentic and cause confusion or misunderstanding as to their authenticity and source.

78.     AtriCure seeks remedies including compensatory damages in an amount to be proven at trial, punitive damages, and its reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT V

### (Fraud Against All Defendants)

79.     AtriCure incorporates paragraphs 1-78 as if set forth fully herein.

80.     To induce AtriCure into the Distribution Agreement with ZenoMed, Dr. Meng and Dr. Bai made false representations to, and concealed material facts from, AtriCure including, but not limited to: (a) knowingly and intentionally misleading AtriCure by representing to AtriCure that they and ZenoMed would be responsible for, and were in fact, engaging with Chinese regulators to obtain necessary approvals; (b) representing that they and ZenoMed would hold AtriCure's confidential and proprietary information secret; (c) representing that they would not compete with AtriCure; (d) representing they had no rights to AtriCure's intellectual property; and (e) representing they would cease using AtriCure's intellectual property.

81.     Defendants concealed the fact they: (a) had no intention to engage with Chinese regulators to obtain necessary approvals on AtriCure's behalf; (b) intended to, and did, cause multi-year delays for Chinese regulatory approval of AtriCure's products; (c) intended to, and did, steal AtriCure's intellectual property to develop, market, and sell illegal counterfeit competitive products through Med-Zenith; (c) intended to, and did, provide AtriCure's confidential and proprietary information to Med-Zenith: (d) intended to, and did, provide AtriCure's confidential and proprietary information to Med-Zenith for the purpose of aiding and/or causing Med-Zenith to submit and receive regulatory approval to sell its counterfeit AtriCure devices prior to AtriCure obtaining necessary approvals for such devices; (e) intended to, and did, cause multi-year delays for regulatory approval of AtriCure products to allow ZenoMed to maintain monopolistic control of ASUs in China; and (f) intended to, and did, allow themselves to gain market share and profits with their own counterfeit competitive devices through ZenoMed and Med-Zenith.

82.     Defendants' misrepresentations to AtriCure were false when made and Defendants knew they were false.  Defendants did not intend to obtain regulatory approval

for AtriCure's products, never intended to keep AtriCure's information confidential, and always intended to use their relationship with AtriCure to steal technology, develop, and sell counterfeit competitive devices.

83.     Defendants' misrepresentations were material to AtriCure's decision to enter into the Distribution Agreement and otherwise enter into and continue its business relationship with ZenoMed and Defendants, provide its confidential and proprietary information to ZenoMed and Defendants, rely upon ZenoMed and Defendants to distribute and sell AtriCure's products and obtain necessary regulatory approvals, and trust Defendants with such information.

84.     AtriCure would never have entered into a business relationship with, or the Distribution Agreement with, ZenoMed and Defendants, trusted them with its confidential information or risked the future success of its products in Defendants' control absent their unequivocal representations.

85.     Defendants made the misrepresentations to AtriCure with the intent that AtriCure rely on them in order for Defendants to obtain the Inventory, control AtriCure's regulatory approvals in China, and gain access to AtriCure's confidential and proprietary information to aid them in their scheme to develop and sell illegal counterfeit competitive products.

86.     AtriCure was unaware of the falsity of Defendants' misrepresentations and did in fact rely upon Defendants' misrepresentations.

87.     AtriCure's reliance on Defendants' misrepresentations was reasonable and justified because, among other reasons, Defendants held themselves out as experienced in obtaining regulatory approvals, experienced and effective at distributing products in the Chinese market, and trustworthy in maintaining confidential and proprietary information without using it to develop competing products after representing they would not compete.

88.     As a direct and proximate result of Defendants' misrepresentations and fraudulent scheme, Atricure entered into a business relationship and agreement to which it otherwise never would have agreed.

89.     AtriCure has been severely damaged by Defendants' conduct.  Based upon Defendants' misrepresentations and development of illegal counterfeit competitive products, AtriCure has lost and continues to lose time in the market for products that should have been approved by were not and has lost and continues to lose customers, sales and goodwill as a result of the existence of illegal counterfeit competitive products on the market.

90.     Upon information and belief, the Defendants' actions were occasioned by bad faith and greed, ill will, and an evil mind, as the Defendants sought to steal and profit from AtriCure's technology related to which AtriCure had previously contracted with ZenoMed.

91.     AtriCure seeks remedies including compensatory damages in an amount to be proven at trial, punitive damages, and its reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT VI

### (Negligent Misrepresentation Against All Defendants)

92.     AtriCure incorporates paragraphs 1-91 as if set forth fully herein.

93.     Dr. Meng and Dr. Bai either purposefully or negligently made false representations to, and concealed material facts from, AtriCure including, but not limited to: (a) misleading AtriCure by representing to AtriCure that they and ZenoMed would be responsible for, and were in fact, engaging with Chinese regulators to obtain necessary approvals; (b) representing that they and ZenoMed would hold AtriCure's confidential and proprietary information secret; (c) representing that they would not compete with AtriCure; (d) representing they had no rights to AtriCure's Trademarks; and (e) representing they would cease using AtriCure's intellectual property.

94.     Defendants purposefully or negligently concealed the fact they: (a) did not engage with Chinese regulators to obtain necessary approvals on AtriCure's behalf; (b) would cause multi-year delays for Chinese regulatory approval of AtriCure's products; (c) would use AtriCure's intellectual property to develop, market, and sell illegal counterfeit products through Med-Zenith; (c) would provide AtriCure's confidential and proprietary information to Med-Zenith: (d) would provide AtriCure's confidential and proprietary information to Med-Zenith for the purpose of aiding and/or causing Med-Zenith to submit and receive regulatory approval to sell its counterfeit AtriCure devices prior to AtriCure obtaining necessary approvals for such devices; (e) would cause multi-year delays for regulatory approval of AtriCure products to allow ZenoMed to maintain monopolistic control of ASUs in China; and (f) would ultimately allow themselves to gain market share and profits with their own counterfeit competitive devices through ZenoMed and Med-Zenith.

95.     Defendants' misrepresentations were material to AtriCure's decision to enter into the Distribution Agreement and otherwise enter into and continue its business relationship with ZenoMed and Defendants, provide its confidential and proprietary information to ZenoMed and Defendants, rely upon ZenoMed and Defendants to distribute and sell AtriCure's products and obtain necessary regulatory approvals, and trust Defendants with such information.

96.     AtriCure would never have entered into a business relationship with, or the Distribution Agreement with, ZenoMed and Defendants, or trusted them with its confidential information or risked the future success of its products in Defendants' control absent their unequivocal representations.

97.     Defendants had reason to believe AtriCure would rely on their representations and did, in fact, rely on those representations.

98.     AtriCure's reliance on Defendants' misrepresentations was reasonable and justified because, among other reasons, Defendants held themselves out as experienced in

obtaining regulatory approvals, experienced and effective at distributing products in the Chinese market, and trustworthy in maintaining confidential and proprietary information without using it to develop competing products after representing they would not compete.

99. As a direct and proximate result of Defendants' misrepresentations and fraudulent scheme, Atricure entered into a business relationship and agreement to which it otherwise never would have agreed.

100. AtriCure has been severely damaged by Defendants' conduct. Based upon Defendants' misrepresentations and development of illegal counterfeit competitive products, AtriCure has lost and continues to lose time in the market for products that should have been approved but were not and has lost and continues to lose customers, sales and goodwill as a result of the existence of illegal counterfeit competitive products on the market.

101. Upon information and belief, the Defendants' actions were occasioned by bad faith and greed, ill will, and an evil mind, as the Defendants sought to steal and profit from AtriCure's technology related to which AtriCure had previously contracted with ZenoMed.

102. AtriCure seeks remedies including compensatory damages in an amount to be proven at trial, punitive damages, and its reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT VII

### (Aiding and Abetting Against All Defendants)

103. AtriCure incorporates paragraphs 1-102 as if set forth fully herein.

104. The Defendants, and each of them, acted in concert together and with ZenoMed and Med-Zenith, to assist ZenoMed in breaching the Distribution Agreement, assist each other in committing fraud and other tortious conduct, and assist Med-Zenith in the theft of Atricure's intellectual property to develop and sell illegal counterfeit medical devices.

105. Defendants substantially assisted, caused, or encouraged each other, ZenoMed, and Med-Zenith in the achievement of illegal contractual breaches and tortious conduct by inducing AtriCure into the Distribution Agreement and other business relationship with ZenoMed for the purpose of forestalling AtriCure's intellectual property protections in China, taking and keeping the Inventory, and stealing, counterfeiting, and selling illegal competing medical devices through their related entity Med-Zenith.

106. As a direct and proximate result of the Defendants' actions, AtriCure has been damaged, as provided herein, stemming from the Defendants' tortious conduct.

107. Upon information and belief, the Defendants' actions were occasioned by bad faith and greed, ill will, and an evil mind, as the Defendants sought to steal and profit from AtriCure's technology related to which AtriCure had previously contracted with ZenoMed.

108. AtriCure seeks remedies including compensatory damages in an amount to be proven at trial, punitive damages, and its reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT VIII

### (Civil Conspiracy Against All Defendants)

109. AtriCure incorporates paragraphs 1-108 as if set forth fully herein.

110. The Defendants, and each of them, acted in concert together and with ZenoMed and Med-Zenith, to assist ZenoMed in breaching the Distribution Agreement, assist each other in committing tortious interference, fraud, misappropriation of trade secrets and unfair competition and other tortious conduct, and assist Med-Zenith in the theft of AtriCure's intellectual property to develop and sell illegal counterfeit medical devices.

111. Defendants substantially assisted, caused, or encouraged each other, ZenoMed, and Med-Zenith in the achievement of illegal contractual breaches and tortious conduct by inducing AtriCure into the Distribution Agreement and other business

relationship with ZenoMed for the purpose of forestalling AtriCure's intellectual property protections in China, obtaining and keeping the Inventory, and stealing, counterfeiting, and selling illegal competing medical devices through their related entity Med-Zenith.

112. As a direct and proximate result of the Defendants' actions, AtriCure has been damaged, as provided herein, stemming from the Defendants' tortious conduct.

113. Upon information and belief, the Defendants' actions were occasioned by bad faith and greed, ill will, and an evil mind, as the Defendants sought to steal and profit from AtriCure's technology related to which AtriCure had previously contracted with ZenoMed.

114. AtriCure seeks remedies including compensatory damages in an amount to be proven at trial, punitive damages, and its reasonable attorneys' fees and other litigation costs reasonably incurred.

## PRAYER FOR RELIEF

**WHEREFORE,** AtriCure respectfully prays for the following relief against Defendants:

A. That Judgment be entered in AtriCure's favor and against Defendants for all the damages caused by Defendants' wrongful conduct, including, but not limited to, compensatory damages, all profits realized by Defendants by reasons of their unlawful acts alleged herein, and punitive damages;

B. For such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff requests trial by jury on all issues so triable.

Dated: January 22, 2019          **DLA PIPER LLP (US)**

By: s/ Richard A. Chesley
    Richard A. Chesley (Bar No. 0029442)
    richard.chesley@dlapiper.com
    444 West Lake Street
    Chicago, Illinois 60606-0089
    Tel: 312.368.4000
    Fax: 312.236.7516

    Mark A. Nadeau (*pro hac vice pending*)
    mark.nadeau@dlapiper.com
    Cameron A. Fine (*pro hac vice pending*)
    cameron.fine@dlapiper.com
    2525 East Camelback Road Suite 1000
    Phoenix, Arizona 85016-4232
    Tel: 480.606.5100
    Fax: 480.606.5101

    *Attorneys for Plaintiff*
    *AtriCure, Inc.*