# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Deborah S. Hunt                   POTTER STEWART U.S. COURTHOUSE                Tel. (513) 564-7000
Clerk                              CINCINNATI, OHIO 45202-3988                  www.ca6.uscourts.gov

Filed:  August 27, 2021

Mr. Richard A. Chesley
DLA Piper
444 W. Lake Street
Suite 900
Chicago, IL 60606

Mr. Daniel J. Donnellon
Sebaly Shillito Dyer
9100 West Chester Towne Centre Drive
Suite 210
West Chester, OH 45069

Mr. Cameron A. Fine
Mr. Kyle Thomas Orne
DLA Piper
2525 E. Camelback Road
Room 1000
Phoenix, AZ 85016

Mr. Erik Puknys
Finnegan, Henderson, Farabow, Garrett & Dunner
3300 Hillview Avenue
Palo Alto, CA 94304

Mr. Qingyu Yin
Finnegan, Henderson, Farabow, Garrett & Dunner
901 New York Avenue, N.W.
Washington, DC 20001-4413

Re:  Case No. 19-4067, *AtriCure, Inc. v. Jian Meng, et al*
Originating Case No. : 1:19-cv-00054

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0199p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

ATRICURE, INC.,

*Plaintiff-Appellee*,

*v.*

No. 19-4067

JIAN MENG aka Larry Meng; BEIJING MEDICAL
SCIENTIFIC CO. LTD. dba Med-Zenith,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-00054—Michael R. Barrett, District Judge.

Decided and Filed:  August 27, 2021

Before:  GUY, LARSEN, and MURPHY, Circuit Judges.

———————————

### COUNSEL

**ON BRIEF:**  Erik R. Puknys, FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP, Palo Alto, California, Daniel J. Donnellon, SEBALY, SHILLITO & DYER,
Dayton, Ohio, Qingyu Yin, FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, LLP, Washington, D.C., for Appellants.  Mark A. Nadeau, Cameron A. Fine, DLA
PIPER LLP (US), Phoenix, Arizona, for Appellee.

MURPHY, J., delivered the opinion of the court in which LARSEN, J., joined.  GUY, J.
(pp. 23–37), delivered a separate dissenting opinion.

———————————

### OPINION

———————————

MURPHY, Circuit Judge.  The Supreme Court has told lower courts to resolve some

arbitration-related questions with a "healthy regard" for the Federal Arbitration Act's "federal

policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). In this appeal, the defendants argue that this pro-arbitration presumption should permit them to enforce a contract's arbitration clause even though they were not parties to, or third-party beneficiaries of, the contract. At one time, they had strong support for this view. Many circuit courts used the federal policy favoring arbitration to broadly enforce arbitration contracts in favor of (or against) nonparties under expansive readings of generic common-law concepts. *See, e.g.*, *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281–82 (6th Cir. 1990). Yet the Act's text compels states only to treat arbitration contracts the same way that they treat "any contract." 9 U.S.C. § 2. So the Supreme Court has since held that courts considering whether arbitration clauses cover nonparties should neutrally apply the relevant state law that otherwise governs. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–32 (2009). The Court did not say that any policy favoring arbitration should influence things. We thus see no room for this federal "dice-loading" rule of construction to resolve the state-law question. Antonin Scalia, *A Matter of Interpretation* 28 (1997); *cf. Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

Instead, we must ask whether Ohio law, when fairly read, permits the defendants to enforce the arbitration clause even though they did not sign the contract. The defendants rely on two "equitable estoppel" theories and one "agency" theory as their grounds to do so. But their first estoppel theory rests on the outdated circuit decisions, which adopted a much broader estoppel test than the test applied by the Ohio Supreme Court. And the defendants forfeited their second estoppel theory. That said, the district court failed to ask the right question under Ohio law when rejecting the defendants' agency theory. All told, then, while we agree that equitable estoppel does not apply, we remand one defendant's agency claim for further proceedings. We thus affirm in part and reverse in part the district court's order denying a stay of this suit pending arbitration.

I

AtriCure, Inc., an Ohio company, has invested millions of dollars and years of research in developing medical devices that treat a serious degenerative heart condition known as atrial fibrillation or "Afib." The company sells these devices to hospitals throughout the world. In the mid-2000s, it sought to enter the Chinese market. To sell products in China, AtriCure needed a

No. 19-4067                        *AtriCure, Inc. v. Meng, et al.*                        Page 3

Chinese agent.  In 2005, Dr. Jian Meng, a Chinese citizen, approached AtriCure about a partnership.  AtriCure and one of Meng's companies agreed that this company would secure the required government approvals and serve as AtriCure's exclusive Chinese distributor.  The parties renewed the same basic agreement each year.  AtriCure eventually began to contract with Beijing ZenoMed Scientific ("ZenoMed"), a company founded by Meng, to distribute its products in China.

The relationship began to sour in 2015.  AtriCure came to believe that another Chinese company founded by Meng—Beijing Medical Scientific ("Med-Zenith")—was attempting to market a dangerous knockoff medical device.  After confronting Meng, AtriCure opted to continue with the relationship because of the significant time and expense required to switch to a different exclusive distributor in China.

In 2016, AtriCure and ZenoMed entered into the "Distribution Agreement" relevant to this appeal.  The agreement included confidentiality and noncompete clauses protecting AtriCure's proprietary information and barring ZenoMed from competing against it.  It also included an arbitration clause designating the China International Economic and Trade Arbitration Commission as the forum.  The clause provided: "Any dispute, controversy or claim arising out of, in connection with or relating to this Agreement (or the interpretation, breach, termination or validity thereof) shall be resolved through arbitration."  Agreement, R.1-2, PageID 47.

The relationship deteriorated further in 2017 when AtriCure claims to have learned that Med-Zenith was attempting to develop other counterfeit devices.  AtriCure let the Distribution Agreement expire at the end of that year.  The company demanded that ZenoMed pay for or return its inventory of AtriCure products and abide by the Distribution Agreement's confidentiality and noncompete clauses.

Receiving no response from ZenoMed, AtriCure took two remedial steps.  AtriCure's first step was a federal complaint in Ohio.  It brought this suit under the district court's diversity jurisdiction against Meng and Med-Zenith.  (It also sued another individual who was not served.)  AtriCure alleged that Meng and Med-Zenith were improperly manufacturing and selling

dangerous counterfeit products based on information that they had wrongly acquired from ZenoMed. It raised state-law claims of tortious interference with contract, misappropriation of trade secrets, unfair competition, deceptive trade practices, fraud, negligent misrepresentation, "aiding and abetting," and "civil conspiracy."

AtriCure's second step was a request for arbitration in China. It invoked the Distribution Agreement's arbitration clause against ZenoMed. In its request for arbitration, AtriCure alleged that ZenoMed had breached the agreement in various ways (by, for example, failing to pay for the inventory and competing against it). AtriCure also alleged that ZenoMed had conspired with Meng and Med-Zenith to steal its intellectual property.

With AtriCure's arbitration pending against ZenoMed, Meng and Med-Zenith sought to stay the company's federal lawsuit against them under the Federal Arbitration Act. While Meng and Med-Zenith were not parties to the Distribution Agreement between AtriCure and ZenoMed, they argued that they could benefit from the agreement's arbitration clause under equitable-estoppel and agency theories. The district court denied their motion.

The court later granted a preliminary injunction barring Meng and Med-Zenith from selling products similar to AtriCure's. We have since affirmed the preliminary injunction. *See AtriCure, Inc. v. Meng*, 842 F. App'x 974, 979–85 (6th Cir. 2021).

This appeal concerns the antecedent arbitration question: Should the district court have stayed AtriCure's suit against Meng and Med-Zenith pending arbitration? The Federal Arbitration Act gives us jurisdiction over the court's denial of a stay. 9 U.S.C. § 16(a)(1)(A); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 627 (2009). We generally review such a denial de novo. *See Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006). But Meng and Med-Zenith raise equitable-estoppel claims on appeal. A circuit split exists over whether courts should review the denial of such an equitable claim de novo or for an abuse of discretion. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 707 (10th Cir. 2011) (citing cases). We need not take sides in this debate. Even under de novo review, the district court correctly rejected Meng and Med-Zenith's estoppel claims.

II

A

Meng and Med-Zenith seek to stay this suit based on the Distribution Agreement's arbitration clause. But they did not enter into the agreement. So we must consider when nonparties to a contract may nevertheless enforce its arbitration requirement. Our answer starts with basic arbitration rules. The Federal Arbitration Act requires a federal court to stay an action if a plaintiff has sued on an "issue referable to arbitration" under a written contract. 9 U.S.C. § 3. Because the availability of a stay turns on whether an enforceable arbitration contract covers the plaintiff's claims, this "stay" question implicates the Act's main provision governing the validity of arbitration contracts: 9 U.S.C. § 2. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537–38 (2019).

Section 2 makes covered arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This language creates "a body of federal substantive law of arbitrability[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). One might have read it to adopt a uniform federal test that uses the common law of contracts as a guide to whether a "valid" or "enforceable" arbitration agreement exists (analogous to the uniform federal test tied to the common law of agency that guides whether a person is an "employee" under a federal statute using that term). *Cf. Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992). But the Court has not read § 2's language in this way. It has instead held that § 2 incorporates a mix of differing *state* contract-law rules supplemented by various uniform *federal* arbitration rules.

The Court starts with a presumption that an arbitration agreement is governed by the contract law of the state whose laws otherwise apply to it. *See Arthur Andersen*, 556 U.S. at 630. Did the parties enter into a binding contract? How should a court interpret its language? Do any contract-law defenses (like fraud or duress) render the contract unenforceable? These types of inquiries are presumptively "question[s] of state law," *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989), governed by the relevant state's contract law, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Doctor's*

*Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87 (1996); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62–63 & 63 n.9 (1995); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987).

But not always. The Court has also read § 2 to superimpose some federal mandates on top of its default rule to follow state law. Most notably, it has read § 2's "saving clause" as adopting a federal neutrality rule: States must put "arbitration agreements on an equal footing with other contracts" and may not target arbitration for uniquely disfavored treatment. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). They, for example, may not require parties to jump through special hoops to enter into arbitration contracts. *See Doctor's Assocs.*, 517 U.S. at 683. Nor may they adopt special defenses for those contracts. *See Concepcion*, 563 U.S. at 341–42.

Apart from this neutrality rule, the Court has adopted dueling federal "presumptions" that either favor or disfavor arbitration depending on the question. *See Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844 (6th Cir. 2020). Because the Federal Arbitration Act evinces a "liberal federal policy favoring arbitration," the Supreme Court has told lower courts to resolve some ambiguities in arbitration contracts in an arbitration-friendly way. *Moses H. Cone*, 460 U.S. at 24–25. Suppose, for example, that parties have undisputedly entered into an arbitration contract, but the contract is unclear about whether it covers one party's tort claim against the other. In that scenario, courts must interpret the agreement in favor of arbitration, no matter how state law would resolve the ambiguity. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418–19 (2019).

At the same time, the Court has read the Act to *disfavor* the arbitration of other questions. *Id.* at 1416–17. The Act makes arbitration "a matter of consent, not coercion," meaning that a party must have voluntarily accepted arbitration before the opposing side can compel it. *Volt*, 489 U.S. at 479. Absent an unambiguous agreement, the Court refuses to infer this consent to arbitrate "fundamental" questions about the arbitration. *Lamps Plus*, 139 S. Ct. at 1416–17. Suppose, for example, that a contract is ambiguous about whether a court or an arbitrator should decide if its arbitration clause covers a party's tort claim. When that different type of ambiguity exists, the Court presumes that the parties left this "gateway" question for the court, not the

arbitrator.  *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529–30 (2019).
The Court likewise presumes that an ambiguous contract does not permit class-based arbitration
even when a state-law rule would resolve this ambiguity differently.  *Lamps Plus*, 139 S. Ct. at
1415–19.

B

How does this mix of state and federal rules apply to whether an arbitration contract may
be enforced by or against nonparties?  Courts have struggled with the question over time.

Circuit courts initially treated the question as one of federal arbitration law divorced from
any state's contract law.  *See Crawford Pro. Drugs Inc. v. CVS Caremark Corp.*, 748 F.3d 249,
261–62 (5th Cir. 2014); *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170–71 (11th Cir.
2011).  These decisions regularly enforced arbitration contracts in favor of or against nonparties
based on expansive readings of common-law concepts like equitable estoppel or agency law.
*See Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 526–28 (5th Cir. 2000); *MS Dealer
Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999); *Letizia v. Prudential Bache Secs.,
Inc.*, 802 F.2d 1185, 1187–88 (9th Cir. 1986).  Why did courts read these common-law concepts
broadly?  They believed that the "strong federal policy favoring arbitration" should influence the
question whether an arbitration contract covered nonparties.  *Letizia*, 802 F.2d at 1188.

Our decision in *Arnold v. Arnold Corp.*, 920 F.2d 1269 (6th Cir. 1990), fits this mold.
There, a company's shareholder sold his shares to the company.  *Id.* at 1271.  The purchase
contract, which was governed by Ohio law, included an arbitration clause.  *Id.*  When the
shareholder later sued the company and its officers, the company compelled arbitration.  *Id.* at
1272.  We held that the officers, who were not parties to the contract, could nevertheless require
the shareholder to arbitrate his claims against them because they were the company's agents.  *Id.*
at 1281–82.  But we did not look to Ohio agency law to decide when an agent could enforce a
principal's contract.  *Id.*  Rather, we adopted a broad (seemingly, federal) rule that a company's
nonparty agents may invoke an arbitration clause in a company contract as "an outgrowth of the
strong federal policy favoring arbitration."  *Id.* at 1281 (quoting *Letizia*, 802 F.2d at 1188); *cf.
Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003).

The Supreme Court jettisoned this federal-common-law approach in *Arthur Andersen*. *See* 556 U.S. at 630–31. There, nonparties to an investment-management contract sought to use "equitable estoppel" to invoke the contract's arbitration clause and compel the investors to arbitrate claims against them. *Id.* at 626–27. The Court clarified that its default rule to start with state law governed this "question of who is bound by" an arbitration clause. *Id.* at 630. It also identified traditional common-law doctrines under which a state might "allow a contract to be enforced by or against nonparties," including "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel[.]" *Id.* at 631 (citation omitted). It then remanded for the lower courts to decide whether the "relevant state contract law" allowed the nonparties to enforce the contract in that case. *Id.* at 632; *cf. GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1643–44 (2020).

After *Arthur Andersen*, circuit courts have recognized that they now must look to the relevant state's common law to decide when nonparties may enforce (or be bound by) an arbitration agreement. *See Crawford*, 748 F.3d at 261–62 & 262 n.9; *see also Neal v. Navient Sols., LLC*, 978 F.3d 572, 575–76 (8th Cir. 2020) (Ohio law); *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 530–31 (5th Cir. 2019) (Texas law); *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018) (Nevada law); *In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017) (California law); *White v. Sunoco, Inc.*, 870 F.3d 257, 263–65 (3d Cir. 2017) (Florida and South Dakota law); *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1293 (10th Cir. 2017) (Utah law); *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 41–44 (1st Cir. 2012) (Massachusetts law). To the extent that our decision in *Arnold* suggested that this issue rested on federal common law, its analysis did not survive *Arthur Andersen*. *See Lawson*, 648 F.3d at 1170–71.

This *state-law* focus also leaves no room for the *federal* presumption favoring arbitration on which pre-*Arthur Andersen* decisions relied. *Arthur Andersen* did not invoke that presumption when telling courts to follow state law, describing it as a "vague prescription" in passing. 556 U.S. at 630 n.5. In addition, this question does not just ask whether the contract should cover a particular claim between two parties who have indisputably consented to

arbitrate. *See First Options*, 514 U.S. at 945. The question instead involves parties who have *not* agreed to arbitrate with each other—at least where, as here, neither party claims to be a third-party beneficiary with independent contract rights. *See id.* Because the federal policy favoring arbitration applies "only when both parties have consented to and are bound by the arbitration clause," courts have refused to apply it to arbitration claims by or against nonparties. *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014); *see IMA, Inc. v. Columbia Hosp. Med. City at Dall., Subsidiary L.P.*, 1 F.4th 385, 391 (5th Cir. 2021); *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1305 (10th Cir. 2017); *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 846–47 (9th Cir. 2013) (per curiam); *cf. McCarthy v. Azure*, 22 F.3d 351, 354–55 (1st Cir. 1994); *West v. Household Life Ins. Co.*, 867 N.E.2d 868, 872 (Ohio Ct. App. 2007).

How about the competing federal presumption disfavoring arbitration when "fundamental arbitration questions" are at stake? *Lamps Plus*, 139 S. Ct. at 1416. Might the question whether an arbitration contract covers nonparties be such a "fundamental" question requiring unambiguous proof before permitting arbitration? One court has suggested as much—at least where (unlike here) a party to a contract attempted to enforce an arbitration clause against a nonparty. *See Taylor v. Ernst & Young, L.L.P.*, 958 N.E.2d 1203, 1213 (Ohio 2011) (citing *First Options*, 514 U.S. at 945). But *Arthur Andersen* left no room for this federal presumption either. It told courts to follow neutral state-law rules when deciding whether nonparties may enforce or be bound by an arbitration contract—without suggesting that the outcome should be influenced by any federal policy-laden "thumb on the scale" favoring or disfavoring arbitration. *See* 556 U.S. at 630–32.

III

Applying *Arthur Andersen* here, we must start by identifying the state law that governs. In a diversity case, the choice-of-law rules of the state in which a district court sits (here, Ohio) tell us the law to pick. *See White*, 870 F.3d at 263. It is not clear how Ohio courts would resolve this choice-of-law question. They follow the Restatement's choice-of-law rules in contract cases. *See Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 208–14 (Ohio 2001) (discussing Restatement (Second) of Conflicts §§ 187–88 (Am. L. Inst. 1971)). And the "Restatement generally respects choice-of-law provisions" in contracts. *Wise v. Zwicker &*

*Assocs., P.C.*, 780 F.3d 710, 715 (6th Cir. 2015). That principle would point us to Chinese law—the law that the Distribution Agreement incorporates. Yet some courts recognize that a contract's choice-of-law provision should not apply when the dispute involves nonparties who did not sign the contract. *See, e.g.*, *Henson*, 869 F.3d at 1059. Perhaps Ohio courts would find these decisions persuasive.

The parties' litigation choices allow us to avoid this choice-of-law issue. Meng and Med-Zenith do not argue for Chinese law; rather, they cite federal cases from around the country without giving us their views on the applicable law. To the extent their briefing implies that federal common law governs, it conflicts with *Arthur Andersen*. AtriCure, by comparison, argues that Ohio law applies, and Meng and Med-Zenith do not dispute this choice in their reply brief. We thus will apply Ohio law without resolving any choice-of-law-questions. *See Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019).

In Ohio, a nonparty to a contract generally may not enforce a party's contractual duties unless the contract makes the nonparty an intended (not just an incidental) third-party beneficiary. *See Hill v. Sonitrol of Sw. Ohio, Inc.*, 521 N.E.2d 780, 784–86 (Ohio 1988); Restatement (Second) of Contracts §§ 302, 315 (Am. L. Inst. 1981). This neutral state-law rule generally prevents nonparties from enforcing arbitration clauses unless they are intended third-party beneficiaries. *See JJ Connor Co. v. Reginella Constr. Co.*, 2014 WL 4401952, at *3–4 (Ohio Ct. App. Sept. 2, 2014); *West*, 867 N.E.2d at 873. Here, although the Distribution Agreement's arbitration clause is broad (it covers claims "relating to" the agreement), the clause does not expressly say whether it reaches claims against nonparties. Meng and Med-Zenith thus do not argue that this clause gives them enforceable rights as third-party beneficiaries (and we need not consider the point).

Meng and Med-Zenith instead rely on doctrines that do not depend on the arbitration clause's text. They argue that they may compel arbitration under two equitable-estoppel theories and one agency theory. We must do our best to predict how the Ohio Supreme Court would approach these three theories. *See Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020).

No. 19-4067                        *AtriCure, Inc. v. Meng, et al.*                        Page 11

A. "Intertwined Claims" Estoppel Theory

Meng and Med-Zenith first argue that equitable estoppel requires AtriCure to arbitrate its claims against them because those claims are "intertwined" with the Distribution Agreement. While the Ohio Supreme Court recognizes a type of equitable estoppel in this setting, the court would not apply the doctrine as liberally as Meng and Med-Zenith need.

1

In Ohio, as in most jurisdictions, "equitable estoppel" generally seeks to prevent a party from fraudulently "having it both ways." *See Doe v. Archdiocese of Cincinnati*, 880 N.E.2d 892, 894–95 (Ohio 2008); *Hortman v. City of Miamisburg*, 852 N.E.2d 716, 719–21 (Ohio 2006); *see generally* 4 Williston on Contracts § 8:3 (4th ed.), Westlaw (database updated May 2021); Richard Frankel, *The Arbitration Clause as Super Contract*, 91 Wash. U. L. Rev. 531, 580–81 (2014).  The Ohio Supreme Court has described the doctrine as follows: "[E]stoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *State ex rel. Madden v. Windham Exempted Vill. Sch. Dist. Bd. of Educ.*, 537 N.E.2d 646, 649 (Ohio 1989) (citation omitted).  In other words, a party cannot state that "Fact A" is true when this view of the world serves its purposes (and the other side has relied on this fact) but later state that "Fact A" is false when this opposite view of the world benefits the party in a different situation (and harms the other side).  *See Doe*, 880 N.E.2d at 894–95.

Ohio courts have applied estoppel to contracts.  *See* Karl Oakes, 42 Ohio Jur. 3d Estoppel and Waiver §§ 81–83, Westlaw (database updated June 2021).  As one example, a party who accepts contractual benefits by treating the contract as binding cannot later refuse to undertake contractual duties by claiming that it has been terminated.  *See Wilson v. Beck Energy Corp.*, 77 N.E.3d 408, 411–14 (Ohio Ct. App. 2016).  As another example, a contracting party who accepts one reading of an ambiguous term cannot later posit a contrary reading.  *See Nat'l City Bank of Cleveland v. Citizens Bldg. Co. of Cleveland*, 74 N.E.2d 273, 281 (Ohio Ct. App. 1947).

Similar principles extend to arbitration contracts. If a contracting plaintiff argues that one of the contract's terms binds a nonparty defendant, the plaintiff cannot also argue, chameleon-like, that the contract's arbitration clause does not apply because the defendant did not sign the contract. *See I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 9 (Ohio Ct. App. 2004). Similarly, if a plaintiff who did not sign a contract seeks to enforce its terms against a defendant who did, the nonparty plaintiff must accept the contract's arbitration clause too. *See Cleveland-Akron-Canton Advert. Coop. v. Physician's Weight Loss Ctrs. of Am., Inc.*, 922 N.E.2d 1012, 1016–17 (Ohio Ct. App. 2009); *cf. Gerig v. Kahn*, 769 N.E.2d 381, 385–86 (Ohio 2002). Equitable estoppel, in short, prevents a party from picking and choosing the contract terms that it alleges govern its relationship with the other litigant. "By accepting the benefits" of the contract as against that litigant, the party must "accept[] the burdens," including an arbitration mandate. *Fawn v. Heritage Mut. Ins. Co.*, 1997 WL 359322, at *2 (Ohio Ct. App. June 30, 1997). (Although estoppel typically requires a party to prove reliance on the conduct or statements of the party to be estopped, *see Madden*, 537 N.E.2d at 649, Ohio courts seem to overlook this traditional reliance element in the arbitration setting, *but cf. Doe v. Carmel Operator*, 160 N.E.3d 518, 523–26 (Ind. 2021).)

This view of estoppel goes only so far. To trigger the doctrine, a plaintiff's claims must seek to enforce duties that "arise from the contract containing the arbitration clause," not from other legal sources (such as a statute or tort law). *Taylor*, 958 N.E.2d at 1213; *see Henderson v. Laws. Title Ins. Corp.*, 843 N.E.2d 152, 161 (Ohio 2006). When a plaintiff has not argued inconsistently that one term of a contract governs the parties' relationship while others do not, Ohio courts reject estoppel claims. *See Taylor*, 958 N.E.2d at 1213–14. That is true even if the noncontract claims "touch matters" related to the contract. *I Sports*, 813 N.E.2d at 9 (citation omitted). And it is true even if a noncontract claim (say, a negligence claim) depends on showing a breach of contract (say, the breach proves the violation of a tort duty of care owed to a nonparty). *See Church v. Fleishour Homes, Inc.*, 874 N.E.2d 795, 806–07 (Ohio Ct. App. 2007).

Two Ohio Supreme Court cases demonstrate these rules. First consider a case that found estoppel: *Gerig*. There, a doctor and hospital entered into an affiliation contract with an arbitration clause. 769 N.E.2d at 382, 384. After the doctor's patients sued him for malpractice,

No. 19-4067                     *AtriCure, Inc. v. Meng, et al.*                     Page 13

they alleged that the doctor's contract with the hospital compelled it to insure him for $4 million. *Id.* at 383.  The patients sought a declaratory judgment against the hospital that their reading of this contract was correct.  *Id.*  But because their suit effectively sought to enforce the hospital's contractual duties, the court held that the patients must accept the arbitration clause.  *Id.* at 385–86.

Next consider a case that rejected estoppel: *Taylor*.  There, an insurer contracted with an accounting firm to conduct an audit.  958 N.E.2d at 1206.  When the insurer became insolvent, a liquidator brought a negligence claim against the accounting firm.  *Id.*  Because the insurer's contract with the accounting firm included an arbitration clause, the firm argued that the liquidator (a nonparty) must arbitrate this tort claim.  *Id.* at 1207.  The court disagreed.  *Id.* at 1213–15.  Although the contract imposed a contractual duty to follow generally accepted auditing standards, Ohio statutes and regulations (not to mention its tort law) imposed the same duty on the accounting firm independent of this contractual duty.  *Id.*  The liquidator thus had not sought to enforce the contract's duties but avoid its arbitration clause.  *Id.*  It sought to enforce the statutory duties.

This dichotomy shows that equitable estoppel does not apply here.  AtriCure's state-law claims do not seek to enforce the Distribution Agreement against Meng and Med-Zenith or rely on any theory that they owed contractual duties to AtriCure notwithstanding their nonparty status.  AtriCure thus has not attempted to "have it both ways" by alleging that some of the agreement's terms bind Meng and Med-Zenith whereas the arbitration clause does not.

Take AtriCure's claim that Meng and Med-Zenith tortiously interfered with its contract.  AtriCure alleges that Med-Zenith (acting through Meng) induced ZenoMed to breach the Distribution Agreement by providing Med-Zenith with AtriCure's proprietary information so that Med-Zenith could create dangerous knockoff products.  This claim in no way suggests that Meng or Med-Zenith owed AtriCure contractual duties.  Rather, the claim relies on a standalone duty grounded in tort law: Do not intentionally and unjustifiably induce another party to breach its contract.  *See Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999).  To be sure, the claim depends on proving that ZenoMed breached its contractual duties (to safeguard AtriCure's information).  *See id.*  But that fact does not trigger estoppel, as an Ohio

court found for a similar tortious-interference claim involving a contract with an arbitration clause. *See I Sports*, 813 N.E.2d at 9. That is because the claim that *ZenoMed* breached its contractual duties does not "enforce" those duties against *Meng* or *Med-Zenith*. The claim seeks to enforce tort duties against them.

Or take AtriCure's claim that Meng and Med-Zenith misappropriated AtriCure's trade secrets. AtriCure alleges that it provided ZenoMed with trade secrets and that Med-Zenith (again acting through Meng) wrongly used those secrets to create the knockoff products. Here again, this claim does not seek to hold Meng or Med-Zenith liable on a contractual duty. Rather, the claim turns on a statutory duty: Do not acquire a party's trade secret by "improper means" or use the trade secret if you obtained it from a person who had "a duty to maintain its secrecy or limit its use[.]" Ohio Rev. Code § 1333.61(B)(1), (2)(b) (defining "misappropriation"). Even if ZenoMed's duty to protect AtriCure's trade secrets arose from the Distribution Agreement, AtriCure does not attempt to enforce that duty against Meng and Med-Zenith. It seeks to enforce this statutory duty against them. *See Taylor*, 958 N.E.2d at 1216.

We will not belabor the point. The same basic problem affects Meng and Med-Zenith's arguments against all of AtriCure's claims. They do not allege that AtriCure seeks to hold them liable for violating contractual duties. Rather, AtriCure's claims rely on distinct tort or statutory duties. *See id.* That fact makes estoppel improper in Ohio.

2

Meng and Med-Zenith do not claim that equitable estoppel would apply under the test we have articulated. They instead argue for a much broader test. They assert that estoppel applies whenever a plaintiff's statutory or tort claim "makes reference to" a contract, *MS Dealer*, 177 F.3d at 947 (citation omitted), or is "intertwined" with the contract's subject matter, *Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 47 (1st Cir. 2008); *see also Grigson*, 210 F.3d at 527–28; *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir. 1988). Meng and Med-Zenith justify this test with federal cases that predate *Arthur Andersen*. But those cases were following a federal-common-law approach; they were not looking to state common law. *Arthur Andersen* has since held that we cannot create our own

body of federal estoppel law.  *See* 556 U.S. at 632; *Crawford*, 748 F.3d at 261–62.  We must look to Ohio law.

In that regard, Meng and Med-Zenith's expansive test conflicts with the narrow way that Ohio courts have applied the doctrine.  In *Taylor*, for example, the negligence claim alleged a violation of a statutory duty (follow generally accepted auditing standards) that was "intertwined" with the subject matter of the contract (which imposed the same duty).  *See* 958 N.E.2d at 1215.  Yet the Ohio Supreme Court rejected the estoppel argument.  *Id.*  Even when tort claims depended on proving a breach of a contract, Ohio's intermediate appellate courts have held, estoppel does not apply as long as the plaintiff has not sought to hold the defendant *itself* to the contractual duties.  *See Church*, 874 N.E.2d at 807; *I Sports*, 813 N.E.2d at 9.  Although Meng and Med-Zenith suggest that the Ohio Supreme Court would reject these lower-court decisions in favor of a broader approach, the decisions better match that court's general view of equitable estoppel's reason for being.  It seeks to regulate fraud, not serve pro-arbitration goals.  *See Doe*, 880 N.E.2d at 895; *cf. Doe*, 160 N.E.3d at 524–26; *Santich v. VCG Holding Corp.*, 443 P.3d 62, 66 (Colo. 2019); *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 271 & n.39 (Tenn. 2017).

That brings us to a related point.  The federal decisions invoking estoppel whenever a claim relates to a contract do not ground this broad test in anything resembling traditional estoppel at common law.  *See* Frankel, *supra*, at 580–87.  While they use the phrase "equitable estoppel," they rest more on the federal policy favoring arbitration and efficiency concerns than on a traditional view of that doctrine.  *See Doe*, 160 N.E.3d at 525–26; *see, e.g.*, *Grigson*, 210 F.3d at 527–28; *MS Dealer*, 177 F.3d at 947.  But the doctrine is named equitable estoppel, not efficiency estoppel.  How has a plaintiff sought to inequitably "have it both ways" by raising a tort claim relating to a contract if the plaintiff does not seek to enforce the contract?  Frankel, *supra*, at 586.  These decisions do not say.  If anything, the decisions call to mind a remark long ago made by Professor Williston: "When a lawyer or a judge does not know what other name to give for his decision to decide a case in a certain way, he says there is an estoppel."  Samuel Williston, *Annual Meeting*, 4 A.L.I. Proc. 61, 89 (1926).  Their main rationale—the federal policy favoring arbitration—also did not survive *Arthur Andersen*'s holding that state law

governs.  *See Rajagopalan*, 718 F.3d at 846–47.  Perhaps that is why *Arthur Andersen* seemingly agreed with a litigant's suggestion in that case that the federal courts had been applying equitable estoppel too loosely.  *See* 556 U.S. at 632.

Shifting gears, Meng and Med-Zenith turn to two of our decisions holding that a party cannot avoid a broad arbitration clause "simply by renaming its claims so that they appear facially outside the scope of the arbitration agreement."  *Simon v. Pfizer Inc.*, 398 F.3d 765, 776 (6th Cir. 2005) (citing *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003)).  They argue that AtriCure has simply renamed its contract claim against ZenoMed as tort claims against them.  This argument overlooks that these two cases do not even use the word "estoppel."  The cases were interpreting the scope of an arbitration clause for claims between contracting parties, not claims involving nonparties.  A broad arbitration clause can cover not just contract claims but tort claims too, especially considering that the federal presumption favoring arbitration applies in this context.  *See Fazio*, 340 F.3d at 395; *see also Lamps Plus*, 139 S. Ct. at 1418–19.  Yet the expansive test applicable in those circumstances is not the test for nonparties. *See Taylor*, 958 N.E.2d at 1213 n.5.  So that test tells us nothing about the Ohio Supreme Court's views on equitable estoppel.

Does it change things, though, that the Ohio Supreme Court's decisions have involved a contracting party attempting to enforce an arbitration clause against a *nonparty*?  *Cf. id.*  This case involves the opposite: Nonparties (Meng and Med-Zenith) seek to enforce the arbitration clause against a *contracting party* (AtriCure).  We fail to see why the difference matters—at least in this case.  The difference might matter if, for example, Meng and Med-Zenith sought to prove that AtriCure intended for them to be third-party beneficiaries with contract rights under the agreement.  *See West*, 867 N.E.2d at 873.  A third-party-beneficiary claim would make less sense *against* a nonparty who did not enter into the contract at all (or seek its benefits).  But Meng and Med-Zenith did not raise such a theory, so we must presume that AtriCure has not consented to arbitrate its claims against them.  That is why Meng and Med-Zenith rely on an outside-the-contract doctrine (estoppel) to coerce AtriCure to arbitrate its claims anyway. Whether used against a party or a nonparty to the contract, estoppel exists to compel a *nonconsenting* litigant to the arbitration table because of its inconsistent positions about whether

No. 19-4067                          *AtriCure, Inc. v. Meng, et al.*                          Page 17

the contract's other terms apply as between the two litigants.  Because AtriCure has not sought to have it both ways in this required fashion, this version of estoppel does not apply here under Ohio law.

## B. "Concerted Misconduct" Estoppel Theory

Meng and Med-Zenith next argue that equitable estoppel should compel AtriCure to arbitrate its claims against them because AtriCure alleges that they engaged in "interdependent and concerted misconduct" with ZenoMed, a contracting party.  *MS Dealer*, 177 F.3d at 947 (citation omitted).  The Ohio Supreme Court has yet to consider this concerted-misconduct version of estoppel, so we must ask whether that court would adopt it.  *See Perry*, 953 F.3d at 421.

Different factors point in different directions.  On the one hand, some Ohio decisions have applied this doctrine or at least referred to it.  *See Discovery Res., Inc. v. Ernst & Young U.S. LLP*, 62 N.E.3d 714, 720–21 (Ohio Ct. App. 2016); *Fields v. Herrnstein Chrysler, Inc.*, 2013 WL 772822, at *6–7 (Ohio Ct. App. Feb. 7, 2013); *see also Fries v. Greg G. Wright 220 & Sons, LLC*, 120 N.E.3d 426, 444 (Ohio Ct. App. 2018); *I Sports*, 813 N.E.2d at 8–9.

On the other hand, these decisions contain little reasoning, *see, e.g.*, *Discovery Res.*, 62 N.E.3d at 720–21, and other state supreme courts have outright rejected this type of claim, *see In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 191–95 (Tex. 2007).  In addition, the courts that accept concerted-misconduct estoppel again fail to identify any traditional common-law "analog" that could justify it.  *See* Frankel, *supra*, at 586 n.229.  This theory permits a defendant alleged to have jointly engaged in fraud with a contracting party to take advantage of those fraud allegations by enforcing an arbitration clause that would not otherwise apply to it.  Traditionally, however, the alleged *fraudster* is the one who is supposed to be estopped, not the alleged *victim*. *See Doe*, 880 N.E.2d at 894–95.  Like the broad view of the first estoppel claim, concerted-misconduct estoppel also originates with federal cases applying federal common law and asserting that "the federal policy in favor of arbitration" would be "thwarted" without it.  *See MS Dealer*, 177 F.3d at 947 (citation omitted).  Yet again, these cases are no longer good law after *Arthur Andersen*.  *See Rajagopalan*, 718 F.3d at 846–47; *Lawson*, 648 F.3d at 1170–71.

No. 19-4067                         *AtriCure, Inc. v. Meng, et al.*                         Page 18

At day's end, we need not resolve whether the Ohio Supreme Court would accept this estoppel claim because Meng and Med-Zenith forfeited it. The district court indicated that Meng and Med-Zenith did not raise concerted-misconduct estoppel. *See Barany-Snyder v. Weiner*, 539 F.3d 327, 331–32 (6th Cir. 2008). And we do not think their reliance on the first estoppel theory preserved this second theory. Under our preservation rules, the two estoppel theories are sufficiently distinct that they do not qualify as subsidiary arguments in support of the same general "claim." *Compare United States v. Reed*, 993 F.3d 441, 453 (6th Cir. 2021), *with Castellon-Vogel v. Int'l Paper Co.*, 829 F. App'x 100, 103 (6th Cir. 2020).

Meng and Med-Zenith do not dispute that the two theories are sufficiently distinct that these defendants needed to raise each one in the district court in order to preserve them both on appeal. Rather, they ask us to interpret stray statements from their stay motion as actually raising concerted-misconduct estoppel. Yet they quote from their motion's statement of facts; the motion's legal argument advocates only for related-to-the-contract estoppel. A party does not preserve an issue in our court by raising it in this "perfunctory" way; the party must connect the relevant facts to the relevant law. *See, e.g.*, *Lou's Transp., Inc. v. NLRB*, 945 F.3d 1012, 1027 (6th Cir. 2019); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). And while they raised this claim in more detail in their reply brief in the district court, they do not dispute that this briefing "came too late" under our well-established law. *See Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579, 590 (6th Cir. 2021) (citing *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010)). We should not place duties on district courts that we would not impose on ourselves. So neither the quoted statements nor the reply statements preserved any concerted-misconduct claim.

## C. Agency Theory

That leaves Meng and Med-Zenith's agency claim. They argue that nonparties to a contract may enforce arbitration clauses when they are agents of one of the contracting parties. The Ohio Supreme Court has not addressed this "agency" theory, so we start with Ohio's intermediate appellate courts. *See Perry*, 953 F.3d at 421. Those courts follow two competing sets of agency principles—one that applies generally and another that applies specifically to arbitration.

As a general matter, Ohio's intermediate courts adhere to the well-established common-law rule that agents do not become contracting parties when they sign a contract on behalf of a disclosed principal or perform duties as agents for that principal. *See Plain Dealer Publ'g Co. v. Worrell*, 898 N.E.2d 1009, 1011–14 (Ohio Ct. App. 2008); *Perrysburg Township v. Rossford*, 778 N.E.2d 619, 624 (Ohio Ct. App. 2002); *Edcom Prods., Inc. v. Wattenmaker Advert., Inc.*, 1982 WL 2648, at *4 (Ohio Ct. App. Dec. 23, 1982); Restatement (Third) of Agency § 6.01 (Am. L. Inst. 2006); 12 Williston on Contracts § 35:34 (4th ed.), Westlaw (database updated May 2021); 3 Am. Jur. 2d Agency § 285, Westlaw (database updated May 2021); *McCarthy*, 22 F.3d at 356. This traditional rule benefits agents because they avoid contract liability even if they cause a breach. *Cf. Dobell v. Koch*, 16 Ohio App. 41, 43–45 (1921). But the rule burdens agents because they have no independent rights under the contract unless they prove that they are intended third-party beneficiaries. *Cf. State ex rel. Brophy v. City of Cleveland*, 49 N.E.2d 175, 176 (Ohio 1943); Restatement (Third) of Agency § 6.01 cmt. d.

Yet Ohio's intermediate courts depart from this approach in the arbitration setting. There, the courts hold that agents may enforce arbitration clauses in contracts signed by their principals when the other party has sued them for actions taken within the scope of their agency. *See Rivera v. Rent A Ctr., Inc.*, 2015 WL 5455882, at *4–6 (Ohio Ct. App. Sept. 17, 2015); *Zilbert v. Proficio Mortg. Ventures, L.L.C.*, 2014 WL 1776004, at *7 (Ohio Ct. App. May 1, 2014); *McCaskey v. Sanford-Brown Coll.*, 2012 WL 1142880, at *3–4 (Ohio Ct. App. Apr. 5, 2012); *Tomovich v. USA Waterproofing & Found. Servs., Inc.*, 2007 WL 4146772, at *3 (Ohio Ct. App. Nov. 26, 2007); *Genaw v. Lieb*, 2005 WL 435211, at *2–4 (Ohio Ct. App. Feb. 25, 2005); *Terry v. Bishop Homes of Copley, Inc.*, 2003 WL 1524491, at *5–6 (Ohio Ct. App. Mar. 26, 2003); *Manos v. Vizar*, 1997 WL 416402, at *1–2 (Ohio Ct. App. July 9, 1997); *see also Neal*, 978 F.3d at 575–77. Some of these decisions rely on broad arbitration clauses that expressly mention agents and so make them third-party beneficiaries. *See Rivera*, 2015 WL 5455882, at *3. For the most part, though, the decisions seem to apply a rule that agents can invoke their principals' arbitration contracts whether or not the agents are third-party beneficiaries. *See Genaw*, 2005 WL 435211, at *3–4.

Where did Ohio's intermediate courts derive this arbitration-only rule? Early decisions cited the federal cases (like our *Arnold* opinion) that permitted agents to invoke their principals' arbitration agreements. *See id.* But this pre-*Arthur Andersen* caselaw was applying a "federal rule designed to protect the federal policy favoring arbitration," not a state common-law rule of agency. *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 11 (1st Cir. 2014); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1121–22 (3d Cir. 1993); *Arnold*, 920 F.2d at 1281–82; *Letizia*, 802 F.2d at 1187–88. The courts reasoned that they would frustrate the pro-arbitration policy if they allowed parties to avoid their duty to arbitrate claims against the other side by suing its agents instead. *See Grand Wireless*, 748 F.3d at 11. This federal rule thus "treats arbitration clauses more favorably than other contract provisions" that are governed by the traditional agency framework. Frankel, *supra*, at 574. Yet the federal rule can no longer supply the definitive answer now that state law governs. *See Arthur Andersen*, 556 U.S. at 632.

Rather, we must predict whether the Ohio Supreme Court would follow the traditional agency rule or the arbitration-specific agency rule. *See Perry*, 953 F.3d at 421. Nothing would prevent it from incorporating the federal pro-arbitration policy into state law—as Ohio's lower courts and some other state courts have done. *See Grand Wireless*, 748 F.3d at 11. Although the Federal Arbitration Act bars states from adopting contract rules that uniquely disfavor arbitration, *Concepcion*, 563 U.S. at 339, it does not prohibit them from singling out arbitration for preferential treatment. That said, nothing would prevent the Ohio Supreme Court from jettisoning this federal doctrine as a matter of state law by neutrally following the traditional agency approach—as other state courts have noted. *See Landry v. Transworld Sys. Inc.*, 149 N.E.3d 781, 787 (Mass. 2020); *cf.* Jeffrey S. Sutton, *51 Imperfect Solutions* 28 (2018). Ultimately, though, we opt not to guess which rule the Ohio Supreme Court would choose. AtriCure has not sufficiently raised any argument that the Ohio Supreme Court would reject the pro-arbitration approach that Ohio's lower courts have adopted in favor of the traditional agency rule. We thus will assume that this broader pro-arbitration approach applies here.

AtriCure raises a different response to this agency claim. Even the broader arbitration-specific agency rule does not permit an agent to enforce a principal's arbitration clause in *all*

circumstances. The rule kicks in only if the agent has been sued for conduct that "arose out of the agency relationship," not for conduct that arose outside that relationship. *Genaw*, 2005 WL 435211, at *3–4; *see Arnold*, 920 F.2d at 1282. AtriCure argues on appeal that it does not seek to hold Meng and Med-Zenith liable for actions that they took as agents of ZenoMed. This agency question has an easy answer for one defendant but a more difficult one for the other.

Med-Zenith presents the easy answer. Neither party has ever claimed that Med-Zenith acted as an agent of ZenoMed in any way. Med-Zenith thus may not rely on any agency theory even under the broader arbitration-specific approach to agency law.

Meng presents the difficult answer. Does AtriCure's suit seek to hold him liable for alleged actions that he took as an agent of ZenoMed, as an agent of Med-Zenith, or both? Unlike in the typical case in which an employee has one employer and the employee's challenged conduct was clearly within the scope of employment, *cf. Arnold*, 920 F.2d at 1282, agency principles paint a more complex picture when an agent serves different roles for different principals, *cf.* Restatement (Third) of Agency § 3.14 & cmt. c; *id.* § 7.03. Claims of intentional misconduct (like some of the claims here) may complicate things further. *See, e.g.*, *Auer v. Paliath*, 17 N.E.3d 561, 566 (Ohio 2014) (citing Restatement (Third) of Agency § 7.07). Yet the parties did not identify the governing agency principles that they believe apply under Ohio law in this more complex setting.

In addition, the Ohio Supreme Court has held that whether an agent acted within the scope of its agency relationship with a principal raises a fact question. *See id.* at 565–66. But the district court did not address the question. It rejected Meng's agency claim solely on the ground that AtriCure "does not bring its claims against Defendant Meng in an attempt to avoid the Agreement's arbitration provision." Op., R.52, PageID 1313–14. That conclusion answered the wrong question under the Ohio cases that we apply here. The critical question is not whether AtriCure sought to avoid the arbitration agreement; it is whether Meng acted as a ZenoMed agent when he engaged in the conduct that AtriCure complains about in this suit (as compared to the conduct that it complains about in the separate arbitration against ZenoMed).

No. 19-4067                    *AtriCure, Inc. v. Meng, et al.*                    Page 22

On appeal, the parties essentially ask us to engage in this fact-finding ourselves.  Like the Seventh Circuit in a similar situation, however, we find it prudent to give the district court the initial opportunity to consider this agency question.  *See Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 743–44 (7th Cir. 2010).  On remand, we also leave for the parties to consider the proper way to resolve this agency question in the context of a motion to stay under 9 U.S.C. § 3 rather than a motion to compel under 9 U.S.C. § 4.  *Cf. Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 836–38, 844 (6th Cir. 2021); *J & R Sportswear & Co. v. Bobbie Brooks, Inc.*, 611 F.2d 29, 30 (3d Cir. 1979).  We express no view on these questions.

\* \* \*

In sum, the district court correctly rejected Meng and Med-Zenith's attempts to equitably estop AtriCure from litigating its claims in court instead of arbitration.  The court also correctly rejected any agency claim by Med-Zenith.  But we remand for the court to consider whether Meng acted as a ZenoMed agent under Ohio law for purposes of AtriCure's claims against him in federal court.  We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

No. 19-4067                            *AtriCure, Inc. v. Meng, et al.*                            Page 23

---

**DISSENT**

---

RALPH B. GUY, JR., Circuit Judge, dissenting.  Defendants Jian Meng and Med-Zenith unambiguously sought a "stay under Section 3 of the [Federal Arbitration Act]" (FAA).  (R. 43, PageID 1178); 9 U.S.C. § 3.  We cannot ignore AtriCure's allegations in the complaint and the testimony of its executives, nor can we rewrite *pro-arbitration* state laws under the banner of *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009).  I would reverse and grant a stay pending the arbitration in China.

## I.

A complete picture of the facts changes the result here.  Defendant Meng (or Dr. Meng) is a resident of China who owns, or is the president of, several entities.  (*See* R. 32-1, ¶¶ 30-31).  Meng is a double-agent.  AtriCure alleges in its complaint—and its COO testified—that Meng is: (1) the "Founder and General Manager" and/or "President of ZenoMed," a non-party Chinese corporation; and (2) the "Founder, President, and CEO" of Med-Zenith, the defendant Chinese company.  (R. 1, ¶¶ 4, 8; R. 32-1, ¶¶ 6, 8; *id.*, PageID 315 (Meng's business card that he gave to AtriCure in 2014)).  The complaint also names a defendant who has not been served, Guanglu Bai (Bai or Dr. Bai), who is the "former Director of Research & Development for ZenoMed and is currently its legal representative."  (R. 1, ¶ 9).  In short, according to AtriCure's COO, "Dr. Meng and Dr. Bai are the primary representatives of ZenoMed."  (R. 32-1, ¶ 5).

Beginning in 2005, AtriCure entered into a series of exclusive distribution agreements with one of Meng's entities for the distribution and registration of AtriCure's products in China, with annual agreement renewals in the years that followed.  (R. 70, PageID 1599; R. 32-1, ¶¶ 15-17, 31-32).  According to AtriCure's President and CEO, with the way "the partnership had been set up," "all of the registrations" for doing business in China and "all the patents in China" for AtriCure's products were held under the name of one of Meng's entities or "in his name."  (R. 70, PageID 1558, 1563-64).  AtriCure's COO also testified that Meng "owned those registrations, and [Meng] had . . . everything, soup to nuts, on how [AtriCure's] devices were

No. 19-4067                    *AtriCure, Inc. v. Meng, et al.*                    Page 24

built." (R. 71, PageID 1641-42). AtriCure learned that one of Meng's entities—Med-Zenith—was creating AtriCure "knock-off" products and confronted Meng. But AtriCure decided to continue the relationship because, as AtriCure's CEO testified, AtriCure "could not sell [its] products in China except through [Meng]'s company, ZenoMed." (R. 70, PageID 1563; R. 1, ¶¶ 4-5).

On January 1, 2016, AtriCure and ZenoMed entered into the Distribution Agreement at issue here. (R. 1, ¶ 20; R. 1-2). The agreement is signed by officers on behalf of AtriCure and signed by Bai on behalf of ZenoMed. (R. 1-2, PageID 49). AtriCure's COO states in his affidavit, however, that "**Dr. Meng was the primary negotiator** and contact point on the business relationship between AtriCure and Dr. Meng's many entities, including during the 2014 to 2016 period in connection with the parties' negotiation of the Distribution Agreement." (R. 32-1, ¶ 35). AtriCure's COO also states that "[a]s part of the business relationship between AtriCure and ZenoMed, **ZenoMed, through its officers Dr. Meng and Dr. Bai**, was responsible for securing regulatory approvals in China for AtriCure's products." (*Id.*, ¶ 17; R. 1, ¶¶ 44, 80, 93-95).

The Distribution Agreement includes confidentiality and non-compete clauses. (R. 1-2, PageID 34, 38). Most notably, the Distribution Agreement also contains a broad, general arbitration provision, and provides that "arbitration shall be conducted in Beijing, PRC and administered by the China International Economic And Trade Arbitration Commission (the "CIETAC") under the CIETAC Administered Arbitration Rules[.]" (R. 1-2, PageID 47).

In 2017, when AtriCure learned that Med-Zenith was again selling AtriCure knock-offs, AtriCure allowed the Distribution Agreement to expire, thereby terminating the agreement. (R. 1, ¶ 22). AtriCure sought relief.

AtriCure's first step was to file this lawsuit against Med-Zenith, Meng, and Bai on January 22, 2019. (R. 1). AtriCure asserts eight state law claims: (1) tortious interference with business relations; (2) misappropriation of trade secrets; (3) unfair competition; (4) deceptive trade practices; (5) fraud; (6) negligent misrepresentation; (7) aiding and abetting; and (8) civil conspiracy.

No. 19-4067                         *AtriCure, Inc. v. Meng, et al.*                         Page 25

ZenoMed is not a party to this action. And yet, AtriCure alleges that "ZenoMed has since **breached the Distribution Agreement** in numerous respects[.]" (R. 1, ¶ 3). "**Dr. Meng, the President of ZenoMed**, and his colleague Dr. Bai, were the primary wrongdoers that **directed and caused ZenoMed's breaches**." (*Id.*, ¶ 4). "[T]hey engaged in and directed a fraudulent scheme in knowingly inducing AtriCure into providing them with its proprietary technology and intellectual property, which they then misappropriated **in concert with ZenoMed** and . . . ("Med-Zenith")[.]" (*Id.*, ¶ 4). "Dr. Meng and Dr. Bai **aided and abetted ZenoMed's contractual breaches**, facilitated a conspiracy to misappropriate AtriCure's intellectual property and business, perpetrated a fraud upon AtriCure, and tortiously interfered with AtriCure's business." (*Id.*, ¶ 5). "Dr. Meng and Dr. Bai provided Med-Zenith with AtriCure's Confidential Information and intellectual property obtained **in their roles with ZenoMed**." (*Id.*, ¶ 40). "Defendants' misrepresentations were **material to AtriCure's decision to enter into the Distribution Agreement and otherwise enter into and continue its business relationship with ZenoMed and Defendants**, . . . and trust Defendants with such information." (*Id.*, ¶ 83). "Defendants, and each of them, **acted in concert together and with ZenoMed and Med-Zenith**, **to assist ZenoMed in breaching the Distribution Agreement,** assist each other in committing fraud and other tortious conduct, and assist Med-Zenith in the theft of AtriCure's intellectual property[.]" (*Id.*, ¶¶ 104, 110).

That is just a sampling. (*Id.*, ¶¶ 24-25, 37, 39-40, 57, 59, 67, 72, 77, 80, 82-84, 88, 93-96, 104-05, 110-11). But AtriCure also devotes a portion of the complaint to the specific promises ZenoMed made under the Distribution Agreement (including reciting specific provisions), ZenoMed's breaches of those promises, and specifically claims entitlement to $1.1 million that ZenoMed owes for inventory received. (*Id.*, ¶¶ 24-34, 93, 80).

Then, on March 19, 2019, AtriCure submitted to the CIETAC (China Arbitration) a demand for arbitration with ZenoMed. (R. 43-1, PageID 1190). AtriCure later argued in the arbitration that the "disputes all arise out of the Distribution Agreements and fall within the scope of dispute resolution matters governed by the arbitration clause in this case." (ECF No. 38, Ex. B., ¶ 16, No. 19-4067 (6th Cir. May 22, 2020)). The arbitration demand and the

complaint here bear an uncanny resemblance. (*See, e.g.*, *id.*, PageID 1191; redline copy, R. 43-2).

Defendants Meng and Med-Zenith moved the district court for a "stay under [§] 3" of the FAA so that the claims could be decided in the China Arbitration with AtriCure's claims against ZenoMed. (R. 43, PageID 1173-74, 1178). On October 25, 2019, the district court denied the motion, concluding that Meng and Med-Zenith, as nonsignatories to the Distribution Agreement, cannot rely on equitable estoppel or agency principles under Ohio law to invoke the arbitration provision. (R. 52, PageID 1314-15). Defendants filed this appeal. (R. 53).

## II.

With all the facts in hand, a faithful application of the equitable estoppel and agency theories under Ohio law permits nonsignatories Meng and Med-Zenith to seek arbitration of AtriCure's claims against them.

### A.

The fundamental problem is that the Supreme Court did not jettison *pro-arbitration* state law rules in *Arthur Anderson*. (Maj. Op. 9-10, 17-18, 20). But that is what this court has done today. *Arthur Anderson* did not announce a novel concept. Long before that decision, the Supreme Court said that "[w]hen deciding whether the parties agreed to arbitrate . . ., courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). This court and the Ohio courts understood that principle and recognized that a nonsignatory may invoke or be bound by an arbitration clause under various theories, including estoppel and agency. *See, e.g.*, *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003); *see also Arnold v. Arnold Corp.–Printed Commc'ns For Bus.*, 920 F.2d 1269, 1271, 1281 (6th Cir. 1990); *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 11 (Ohio Ct. App. 2004); *Genaw v. Lieb*, No. 20593, 2005 WL 435211, at *3-4 (Ohio Ct. App. 2005).

*Arthur Anderson* came about because a panel of this court decided to break rank. Rejecting the nonsignatory defendants' argument that "principles of equitable estoppel

demanded that [plaintiffs] arbitrate their claims under their investment agreements with [the investment company]," this court concluded that § 3 of the FAA is "inapplicable" because "the defendants are not signatories to the written agreement in question." *Carlisle v. Curtis, Mallet-Prevost, Colt & Mosle, LLP*, 521 F.3d 597, 598, 600 (6th Cir. 2008). The Supreme Court reversed this court's decision in *Arthur Anderson*, 556 U.S. at 632. In doing so, the Court made it clear that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel[.]'" *Id.* at 631 (quoting 21 R. Lord, Williston on Contracts § 57:19 (4th ed. 2001)); *accord GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1643 (2020).

As I see it, the only "federal common-law approach" *Arthur Anderson* "jettisoned" was this court's use of federal law to *restrict* arbitration. (Maj. Op. 8-10, 17, 20). *Arthur Anderson* explicitly stated that federal law "cannot possibly require the disregard of state law *permitting* arbitration by or against nonparties to the written arbitration agreement." 556 U.S. at 634 n.5 (emphasis in original). The Supreme Court's decision established a shield for state law so long as it "permit[s]" arbitration. *Id.* Indeed, we can invoke federal law to jettison state law rules only when: (1) "state law prohibits outright the arbitration of a particular type of claim"; or (2) an otherwise "generally applicable" state law rule "stand[s] as an obstacle to the accomplishment of the FAA's objectives." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341-43 (2011). Neither situation is implicated by Ohio's pro-arbitration rules for equitable estoppel and agency. The majority even acknowledges that federal law "does not prohibit [states] from singling out arbitration for preferential treatment." (Maj. Op. 23-24). And yet, the majority takes issue with perceived differences between Ohio's "traditional" common law and the Ohio courts' pro-arbitration rules for equitable estoppel and agency in the arbitration context. (Maj. Op. 14, 17-18, 20, 22-23, 24).

Today history repeats itself. Instead of providing a shield, the majority has used *Arthur Anderson* as a sword against Ohio's pro-arbitration rules.

## B.  Equitable Estoppel

Ohio law is clear that two equitable estoppel theories permit nonsignatory defendants Meng and Med-Zenith to invoke arbitration under the Distribution Agreement.  Equitable estoppel is generally applied to "intertwined claims" in two circumstances:  (1) "where a signatory must rely on the terms of the written agreement in asserting claims against a nonsignatory"; and (2) "where the signatory alleges substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories to the contract."  *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004) (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000), and *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)).   After *Arthur Anderson*, Ohio courts still apply the two theories stated in *I Sports.  See, e.g.*, *Fries v. Greg G. Wright & Sons, LLC*, 120 N.E.3d 426, 444 (Ohio Ct. App. 2018); *Fields v. Herrnstein Chrysler, Inc.*, No. 12CA827, 2013 WL 772822, at *6-7 (Ohio Ct. App. Feb. 7, 2013); *Short v. Res. Title Agency, Inc.*, No. 95839, 2011 WL 1203906, at *3 (Ohio Ct. App. Mar. 31, 2011).

AtriCure advocates for application of the theories articulated in *I Sports*.  (Appellee Br. 22-23).  And Meng and Med-Zenith advance the same theories by relying on the two federal cases *I Sports* cited.  (Appellant Br. 21-22, 26-27, 32; Reply Br. 13).

## 1.  "Relying On The Contract" Estoppel Theory

The first estoppel theory applies here.  Consistent with *I Sports*, the test the Ohio Supreme Court has since applied is whether the plaintiff "asserted claims that arise from the contract containing the arbitration clause."  *Taylor v. Ernst & Young, L.L.P.*, 958 N.E.2d 1203, 1213 (Ohio 2011) (citing *Gerig v. Kahn*, 769 N.E.2d 381, 386 (Ohio 2002)).[1]  *Taylor* concluded that the nonsignatory plaintiff's accounting malpractice claim arose "independently" of the contract and was based on allegations identifying "statutory duties and certifications filed in the public record."  *Id.* at 1214, 1215.  The court explained that the claim did not "require the court

---

[1] In *Gerig v. Kahn*, the court held that "a signatory to a contract may enforce an arbitration provision against a nonsignatory seeking a declaration of the signatories' rights and obligations under the contract." 769 N.E.2d at 386.  But neither *Gerig* nor *Taylor* held (much less suggested) that estoppel is *only* applicable in that situation.  (Maj. Op. 14-15).

to interpret the [agreement] to determine [the accounting firm's] obligations to [the insurance company]." *Id.* at 1215 ("In no form does the liquidator seek judicial interpretation of the [agreement]."). In particular, "the liquidator could trace the alleged harm to [the accounting firm] via the public filings and certifications, without reference to the [agreement]." *Id.* at 1216; *see also Henderson v. Lawyers Title Ins. Corp.*, 843 N.E.2d 152, 155 (Ohio 2006) (nonsignatory plaintiffs could not arbitrate their claims because they alleged entitlement to a premium credit "under the applicable rate schedule filed by [the insurance company]," not under the insurance contract).

*Taylor* did not adopt a rule rejecting equitable estoppel whenever a plaintiff asserts their claims under "a statute or tort law." (Maj. Op. 14). The doctrine extends to a signatory's statutory and tort claims. *See Fries*, 120 N.E.3d at 444 (concluding that signatory's *tort* claims for "breach of fiduciary duty, unjust enrichment, and conversion" were subject to arbitration with nonsignatory defendants), *appeal denied*, 114 N.E.3d 1208 (Ohio 2019); *see also Fields*, 2013 WL 772822, at *6-7 (concluding that "concerted misconduct" estoppel required arbitration for signatory's claims against nonsignatories for violation of consumer protection *statutes* and common law *tort* duties).[2]

Here, in contrast to *Taylor*, AtriCure cannot make out its claims "without reference" to the Distribution Agreement; its claims will inherently require "judicial interpretation" of the agreement. *Taylor*, 958 N.E.2d at 1215-16. In other words, AtriCure "must rely on the terms of the [Distribution Agreement] in asserting [its] claims." *I Sports*, 813 N.E.2d at 8; *see also GE Energy Power*, 140 S. Ct. at 1644.

For example, AtriCure alleges a claim for tortious interference with a business relationship. Under Ohio law, such a claim requires a plaintiff to show: "(1) the existence of a contract and/or business relationship; (2) the tortfeasor's knowledge thereof; (3) the tortfeasor's intentional interference *causing a breach or termination of the relationship*; (4) *lack of*

---

[2]Reliance on *Church v. Fleishour Homes, Inc.*, 874 N.E.2d 795 (Ohio Ct. App. 2007), is inapposite. (Maj. Op. 14, 17). That case turned on the unique fact that a "child's cause of action for personal injuries is separate and distinct from that of her parents' claims, [so] it cannot be subject to the parents' agreement to arbitrate." *Id.* at 806-07.

No. 19-4067                           *AtriCure, Inc. v. Meng, et al.*                           Page 30

*justification*; and (5) damages." *Harris v. City of St. Clairsville*, 330 F. App'x 68, 79 (6th Cir. 2008) (emphasis added) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)).

Here, AtriCure relies heavily on ZenoMed's specific contractual breaches caused by defendants. "ZenoMed has since **breached the Distribution Agreement** in numerous respects[.]" (R. 1, ¶ 3). "Dr. Meng, the President of ZenoMed, and his colleague Dr. Bai, were the primary wrongdoers **that directed and caused ZenoMed's breaches**." (*Id.*, ¶ 4). "Defendants, and each of them, acted in concert together and **with ZenoMed** and Med-Zenith, **to assist ZenoMed in breaching the Distribution Agreement,** assist each other in committing fraud and other tortious conduct, and assist Med-Zenith in the theft of AtriCure's intellectual property to develop and sell illegal counterfeit medical devices." (*Id.*, ¶ 104). The list goes on. (*Id.*, ¶¶ 57, 104-05, 110-11). AtriCure even goes so far as to incorporate and recite specific provisions of the Distribution Agreement covering confidentiality, non-compete, inventory reports, books and records, trademarks, and use of intellectual property, and alleges how ZenoMed has breached those provisions. (*Id.*, ¶¶ 24-34, 93, 80).

Moreover, "establishment of the fourth element of the tort of tortious interference with contract, *lack of justification*, requires proof that the defendant's interference with another's contract was improper." *Fred Siegel*, 707 N.E.2d at 858 (emphasis added). Similarly, AtriCure's misappropriation-of-trade-secret claim requires AtriCure to show: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) *the unauthorized use of a trade secret*." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (emphasis added) (applying Ohio law). Recall that the parties' arrangement was set up so that "all of the registrations" for doing business in China and "all the patents in China" for AtriCure's products were held under the name of one of Meng's entities or "in his name." (R. 70, PageID 1563-64). Outside the Distribution Agreement, Meng "owned those registrations." (R. 71, PageID 1641-42). The only way AtriCure could do business in China was "through [Meng]'s company, ZenoMed." (R. 70, PageID 1563; R. 1, ¶¶ 4-5). Without the various provisions of the Distribution Agreement, there

No. 19-4067                    *AtriCure, Inc. v. Meng, et al.*                    Page 31

was nothing preventing Meng or his entities from doing as they pleased with AtriCure's technology in China.

How exactly then does AtriCure show "lack of justification" or "unauthorized use" on the part of Med-Zenith and Meng (a double-agent), "without reference" to—and ultimately obtaining a favorable "judicial interpretation" that ZenoMed *breached*—the confidentiality, non-compete, and nondisclosure provisions of the Distribution Agreement? *See Taylor*, 958 N.E.2d at 1215-16; *I Sports*, 813 N.E.2d at 8. Short of a breach of contract claim between *signatories*, it is difficult to imagine a case where a plaintiff must rely more on the terms of a contract than here. Because AtriCure must rely on the terms of the Distribution Agreement to make out its claims, Meng and Med-Zenith are entitled to invoke the arbitration clause.

### 2. "Concerted Misconduct" Estoppel Theory

The second circumstance under which equitable estoppel is applied arises "when the signatory to the contract alleges 'substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.'" *I Sports*, 813 N.E.2d at 9 (quoting *Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 348 (5th Cir. 2002)). The majority concludes that defendants Meng and Med-Zenith forfeited the issue by failing to raise the second estoppel theory in the district court. (Maj. Op. 21.) Not so.

Meng and Med-Zenith's reply in support of their motion for an arbitration stay recognized that AtriCure's arguments against equitable estoppel included: (1) that AtriCure "does not rely on the 2016 Distribution Agreement in asserting [its] claims"; and (2) AtriCure "does not allege interdependent and concerted misconduct by a nonsignatory and signatory to the Distribution Agreement." (R. 51, PageID 1298-99.) Meng and Med-Zenith argued:

> [T]he plain text of the Complaint contradicts Plaintiff's assertions. First, Plaintiff's claims rely on the Distribution Agreement because they depend on a breach of that contract by ZenoMed. Second, in its Complaint Plaintiff specifically alleges **significant interdependent and concerted misconduct by Defendants and ZenoMed . . .**

(R. 51, PageID 1299.) Defendants quoted extensively from AtriCure's complaint to support their position and then concluded that "Plaintiff's claims here rely on allegations that Defendants not

only caused Plaintiff to enter into the Distribution Agreement with ZenoMed, but also that **Defendants conspired with and acted in concert with ZenoMed to cause injury to Plaintiff**." (*Id.*, PageID 1299-300). "Defendants' reply brief does nothing more than reply to the allegations made in [AtriCure]'s response." *Asbury v. Teodosio*, 412 F. App'x 786, 792 (6th Cir. 2011); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (explaining that "reply briefs *reply* to arguments made in the response brief" (internal quotation marks and citation omitted)). Meng and Med-Zenith preserved the issue.

Even if that was not the case, once a *claim* is "properly presented, a party can make any *argument* in support of that claim; parties are not limited to the precise arguments they made below." *Citizens United v. FEC*, 558 U.S. 310, 330-31 (2010) (emphasis added) (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995)). This court's cases are not to the contrary. (Maj. Op. 21). "Our forfeiture cases 'recognize a distinction between failing to properly raise a claim before the district court and failing to make an argument in support of that claim.'" *United States v. Reed*, 993 F.3d 441, 453 (6th Cir. 2021) (brackets and citations omitted). "[W]e typically find no forfeiture on appeal when 'a particular authority or strain of the argument was not raised below, as long as the issue itself was properly raised.'" *Id.* (citation omitted). AtriCure does not argue, and defendants do not concede, that the two estoppel theories are "distinct" claims. (*Cf.* Maj. Op. 22); (Appellee Br. 28-29; Appellant Br. 33-34; Reply Br. 16-17). That is because defendants' argument that the second estoppel theory should apply is not a new claim. *Cf. Citizens United*, 558 U.S. at 330-31. Rather, it is an argument that is a "subsidiary" or "strain" of the claim raised below—namely, that equitable estoppel allows them to invoke arbitration for the claims against them. *See Reed*, 993 F.3d at 453. And on appeal, both parties have fully briefed the second equitable estoppel theory. (Appellant Br. 33-37; Appellee Br. 28-31; Reply Br. 16-18). Because Meng and Med-Zenith not only properly presented their equitable estoppel claim but also argued the second subsidiary theory, the issue is not forfeited.[3]

---

[3]Even assuming *arguendo* that defendants' second estoppel theory constitutes a new claim raised for the first time on appeal, it satisfies this court's criteria for consideration. The question— whether the complaint "alleges" concerted misconduct between ZenoMed and one or more of the nonsignatory defendants, *I Sports*, 813 N.E.2d at 9—"is a purely legal one," and "the parties have fully briefed the issue," such that "it is 'presented with

No. 19-4067                    *AtriCure, Inc. v. Meng, et al.*                    Page 33

The second estoppel theory plainly applies in this case.  The complaint is replete with allegations of collusion, aiding and abetting, and joint misconduct.  (*See, e.g.*, R. 1, ¶¶ 4-5, 39, 57, 94, 104, 110-11).  For instance, the complaint alleges that the "**Defendants, and each of them, acted in concert together and with ZenoMed** and Med-Zenith, to assist ZenoMed in breaching the Distribution Agreement, assist each other in committing tortious interference, fraud, misappropriation of trade secrets and unfair competition and other tortious conduct."  (R. 1, ¶ 110).  AtriCure's complaint also expressly alleged a civil conspiracy claim, which, by definition, is "a malicious combination of two or more persons to injure another in person or property[.]"  *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (citation omitted); (*e.g.*, R. 1, ¶¶ 39, 110-11).  That alone triggers the second estoppel theory.  *Discovery Res., Inc. v. Ernst & Young U.S. LLP*, 62 N.E.3d 714, 720-21 (Ohio Ct. App. 2016) (holding that signatory's claims against nonsignatories were subject to arbitration because "[t]here can be no question that [plaintiff]'s claim for conspiracy 'raises allegations of . . . concerted misconduct'" (citation omitted)); *see also Fields*, 2013 WL 772822, at *6-7 (applying the rule stated in *I Sports* and *Hill*, and concluding that "concerted misconduct" estoppel applied); *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) ("Having alleged in [a] RICO action that the Deutsche Bank and BDO defendants acted in concert to defraud plaintiffs, . . . plaintiffs cannot now escape the consequences of those allegations[.]").

As with some of the defendants in *Hill*, which *I Sports* relied upon, "the facts before us insofar as [AtriCure]'s claims against nonsignator[ies] [Med-Zenith, Meng, and Bai] are inherently inseparable from its claims against [ZenoMed].  [AtriCure]'s complaint makes identical claims against both defendants."  *Hill*, 282 F.3d at 349.  In fact, it is telling that the China Arbitration demand against ZenoMed is a near carbon-copy of the allegations in this case.  (R. 43-1; *see* redline copy, R. 43-2).  Under Ohio law, the second estoppel theory applies here.

---

sufficient clarity and completeness' to ensure a proper resolution."  *United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006) (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988)).  The resolution of the issue is also clear here, and "failing to consider the issue would result in a plain miscarriage of justice—namely, allowing a conclusion of law to stand that is clearly in error."  *Id.* at 561 (deciding to consider an issue raised for the first time on appeal).

### C.  Agency Theory

A remand on the agency theory is not warranted.  Under Ohio law, "a nonsignatory agent may enforce an arbitration agreement between a plaintiff and the agent's principal when, as in this case, the alleged misconduct *arose out of the agency relationship*."  *Genaw*, 2005 WL 435211, at *4 (emphasis added); *Rivera v. Rent A Ctr., Inc.*, No. 101959, 2015 WL 5455882, at *4 (Ohio Ct. App. Sept. 17, 2015); *accord Neal v. Navient Sols., LLC*, 978 F.3d 572, 575 (8th Cir. 2020) (applying Ohio law for agency and estoppel).  "[Plaintiffs] will not be allowed to circumvent their promise to arbitrate . . . by simply suing [nonsignatory agents] separately from [the signatory corporation]."  *Manos v. Vizar*, No. 96 CA 2581-M, 1997 WL 416402, at *1 (Ohio Ct. App. July 9, 1997).  The majority concedes that this approach "applies here."  (Maj. Op. 22, 24).

But the majority's remand is not supported by *Janiga v. Questar Capital Corporation*, 615 F.3d 735 (7th Cir. 2010).  There, the district court did not believe there was a "meeting of the minds" between the alleged signatories to the agreement, so the district court ended its analysis there without addressing whether the nonsignatories could invoke the arbitration agreement under an agency theory.  *Id*. at 739.  The Seventh Circuit, however, found that there was a contract between the signatories, *id*. at 742-43, but remanded because the district court had no "opportunity to pass on [the agency] issues in the first instance," *id*. at 743-44.  That is not the case here.

In this case, the district court cited the rule and considered the agency issue.  (R. 52, PageID 1313-14 ("[T]he agency exception may be invoked when the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." (quoting *I Sports*, 813 N.E.2d at 11))).  But the district court avoided deciding whether Meng was an agent for ZenoMed.  Instead, the district court stated in conclusory fashion that AtriCure "does not bring its claims against Defendant Meng in an attempt to avoid the Agreement's arbitration provision."  (R. 52, PageID 1313).  The court erred because the whole point of the agency theory is that "nonsignatory agents should also have the benefits of the arbitration agreements made by their principal."  *Hussein v. Hafner &*

*Shugarman Ents., Inc.*, No. 09-020, 2010 WL 3481492, at *7 (Ohio Ct. App. Aug. 13, 2010). The district court simply misapplied the law to the facts, and that is no reason for a remand.

Here, Ohio's agency theory applies to Meng.  AtriCure alleges that "**Zeno[M]ed has, at all times, been chiefly represented by the two Defendants**.  These Defendants acted together and in conspiracy with others to form a competing company and knock-off the AtriCure products." (R. 1, ¶ 24).  "**To induce AtriCure into the Distribution Agreement** with ZenoMed, **Dr. Meng and Dr. Bai made false representations** to, and concealed material facts from, AtriCure[.]" (*Id.*, ¶¶ 80, 83-84, 95-96).  "As ZenoMed was charged with responsibility for licensing in China, and held itself out as having expertise to do so, **the officers of ZenoMed, the Defendants here**, were given access to proprietary and confidential information owned by AtriCure." (*Id.*, ¶ 25).  "**Dr. Meng and Dr. Bai** were fully aware of the Distribution Agreement as **they are the principals of ZenoMed. They caused ZenoMed to breach** the Distribution Agreement[.]" (*Id.*, ¶ 57; *see also id.*, ¶¶ 24-25, 31, 37-40, 57).  "**ZenoMed and its principals, Dr. Meng and Dr. Bai**, have stolen AtriCure's intellectual property, which they are now marketing for sale around the world." (*Id.*, ¶ 37; *see also id.*, ¶¶ 4-5, 24-25, 31, 37-40, 57).  "**Dr. Meng, the President of ZenoMed**, and his colleague Dr. Bai, were the primary wrongdoers that **directed and caused ZenoMed's breaches**." (*Id.*, ¶ 4).  The testimony of AtriCure's COO reinforces the allegations.[4]  There is no doubt that AtriCure's claims arise "out of the agency relationship." *Genaw*, 2005 WL 435211, at *4.

We should not feign ignorance of these facts to give the district court a second bite at the apple.  The allegations in the complaint and the other facts in the record are sufficient to determine the issue and we need only apply the law. *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 10 (1st Cir. 2014) ("Grand's complaint makes clear that Ms. McCahill's alleged actions were taken in her capacity as Verizon's agent or employee. . . . Grand, in naming Ms.

---

[4]AtriCure's COO states that Dr. Meng "is the Founder and General Manager of ZenoMed." (R. 32-1, ¶ 6; *id.*, PageID 315). "Dr. Meng and Dr. Bai are the **primary representatives of ZenoMed**." (*Id.*, ¶ 5). "**Dr. Meng was the primary negotiator** and contact point on the business relationship between AtriCure and Dr. Meng's many entities, including during the 2014-2016 period in connection with the parties' negotiation of **the Distribution Agreement**." (*Id.*, ¶ 35). AtriCure's COO also states that "[a]s part of the business relationship between AtriCure and ZenoMed, **ZenoMed, through its officers Dr. Meng and Dr. Bai**, was responsible for securing regulatory approvals in China for AtriCure's products." (*Id.*, ¶ 17).

McCahill in its complaint, identified her as "Director of Indirect Communication, Erin McCahill."); *see also Denney*, 412 F.3d at 70 (having alleged "defendants acted in concert," plaintiffs "cannot now escape the consequences of those allegations"). After all, we review the denial of an arbitration stay de novo. *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006). Because AtriCure cannot renege on the allegations in its complaint and the testimony of its COO, there is no basis for a remand.

## D.

The Supreme Court has instructed that "[w]hen [the highest court of the state] has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). And "[w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* at 237. A "federal court is not free to apply a different rule however desirable it may believe it to be, and even though it may think that the state Supreme Court may establish a different rule in some future litigation." *Id.* at 238. Moreover, this court has repeatedly counseled:

> [F]ederal courts sitting in a diversity case are in a particularly poor position to endorse [a] fundamental policy innovation . . . . Absent some authoritative signal from the legislature of the courts of the state, [there is] no basis for even considering the pros and cons of innovative theories.

*Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577-78 (6th Cir. 2004) (cleaned up).

In the majority's view, Ohio's estoppel and agency rules in the arbitration context are not the same as those in other contexts. But we cannot rewrite state rules simply because we think the rules in other contexts are a "better match." (Maj. Op. 17-18, 20, 22-24). The cases that the majority relies on from other contexts are entirely irrelevant here.[5]

---

[5]For example, *Doe v. Archdiocese of Cincinnati*, 880 N.E.2d 892, 893-94 (Ohio 2008), is not a contract or arbitration case. There, the court held that general principles of equitable estoppel did not apply to save a plaintiff's

The majority has not pointed to a "clear and persuasive indication" by the Ohio Supreme Court that it would adopt the rules applied or suggested by the majority.  As a result, we must apply the rules that the Ohio courts apply in the arbitration setting.  Application of those rules requires reversal.

"Just as judicial antagonism toward arbitration before the Arbitration Act's enactment 'manifested itself in a great variety of devices and formulas declaring arbitration against public policy,' *Concepcion* teaches that [courts] must be alert to new devices and formulas that would achieve much the same result today."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018) (quoting *Concepcion*, 563 U.S. at 342).  Today's decision is one such example of a "new device."

\*      \*      \*

For these reasons, I respectfully dissent.

---

untimely filed complaint for tort claims arising from her sexual relationship with a priest because defendants did not do "anything that was designed to prevent [plaintiff] from filing suit."  880 N.E.2d at 893-95; *see also State ex rel. Madden v. Windham Exempted Vill. Sch. Dist. Bd. of Educ.*, 537 N.E.2d 646, 649 (Ohio 1989) (involving asserted defenses of "estoppel and laches" to bar a claim).  And *Hortman v. City of Miamisburg*, 852 N.E.2d 716, 718-19 (Ohio 2006), was not an arbitration case.  That case involved *claims* for "negligence, conversion, and promissory estoppel" arising from a city's "destruction" of trees on plaintiffs' property, and the court held that "the doctrines of equitable estoppel and promissory estoppel are inapplicable against a political subdivision when [it] is engaged in a governmental function."  *Id.*  Neither the reasoning nor the holding of a significant number of the cases the majority cites has any application here.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-4067

ATRICURE, INC.,

     Plaintiff - Appellee,

     v.

JIAN MENG aka Larry Meng; BEIJING MEDICAL
SCIENTIFIC CO. LTD. dba Med-Zenith,

     Defendants - Appellants.

> **FILED**
> Aug 27, 2021
> DEBORAH S. HUNT, Clerk

Before:  GUY, LARSEN, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

     THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

     IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk